# UNITED STATES et al. v. LaSALLE NATIONAL BANK et al.

No. 77–365.   Argued March 29, 1978—Decided June 19, 1978

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and POWELL, JJ., joined. STEWART, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST and STEVENS, JJ., joined, *post*, p. 319.

*Deputy Solicitor General Wallace* argued the cause for the United States et al. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Ferguson, Stuart A. Smith, Robert E. Lindsay, Charles E. Brookhart,* and *Carleton D. Powell.*

*Matt P. Cushner* argued the cause for respondents. With him on the brief was *Gregory J. Perry.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case is a supplement to our decision in *Donaldson* v. *United States,* 400 U. S. 517 (1971). It presents the issue whether the District Court correctly refused to enforce Internal Revenue Service summonses when it specifically found that the special agent who issued them "was conducting his investigation solely for the purpose of unearthing evidence of criminal conduct." 76–1 USTC ¶ 9407, p. 84,073, 37 AFTR 2d ¶ 76–582, p. 76–1240 (ND Ill. 1976).

I

In May 1975, John F. Olivero, a special agent with the Intelligence Division of the Chicago District of the Internal Revenue Service (hereinafter IRS or Service), received an assignment to investigate the tax liability of John Gattuso for his taxable years 1970–1972. App. 26–27, 33. Olivero testified that he had requested the assignment because of information he had received from a confidential informant and from an unrelated investigation. *Id.*, at 35. The case was not referred to the IRS from another law enforcement agency, but the nature of the assignment, Olivero testified, was "[t]o investigate the possibility of any criminal violations of the Internal Revenue Code." *Id.*, at 33. Olivero pursued the case on his own, without the assistance of a revenue agent.[1] He received information about Gattuso from the Federal Bureau of Investigation as a result of the previous investigation. *Id.*, at 36. He solicited and received additional data from the United States Attorney for the Northern District of Illinois, the Secret Service, the Department of Housing and Urban Development, the IRS Collection Division, and the Cosmopolitan National Bank of Chicago. *Id.*, at 37–40.

Mr. Gattuso's tax returns for the years in question disclosed rental income from real estate. That property was held in

---

[1] Frequently, a revenue agent of the IRS Audit Division will refer a case on which he is working to the Intelligence Division for investigation of possible fraud. After such a referral, and at other times, the special agent and the revenue agent work together. Because of the importance and sensitivity of the criminal aspects of the joint investigation, the special agent assumes control of the inquiry. See, *e. g.*, Internal Revenue Manual, ch. 4500, §§ 4563.431–4565.44 (CCH 1976 and 1978).

As part of a planned reorganization, the IRS has announced its intention to redesignate the Audit Division and the Intelligence Division as the Examinations Division and the Criminal Enforcement Division, respectively. IRS News Release, Feb. 6, 1978.

Illinois land trusts [2] by respondent LaSalle National Bank, as trustee, a fact revealed by land trust files collected by the IRS from banks. *Id.*, at 27, 45. In order to determine the accuracy of Gattuso's income reports, Olivero proceeded to issue two summonses, under the authority of § 7602 of the Internal Revenue Code of 1954, 26 U. S. C. § 7602,[3] to respondent bank. Each summons related to a separate trust and requested, among other things, that the bank as trustee appear before Olivero at a designated time and place and produce its "files relating to Trust No. 31544 [or No. 35396]

---

[2] Respondents describe an Illinois land trust as follows:

"An Illinois land trust is a contract by which a trustee is vested with both legal and equitable title to real property and the interest of the beneficiary is considered personal property. Under this trust the beneficiary or any person designated in writing by the beneficiary has the exclusive power to direct or control the trustee in dealing with the title and the exclusive control of the management, operation, renting and selling of the trust property together with the exclusive right to the earnings, avails and proceeds of said property. Ill. Rev. Stat. ch. 29, § 8.31 (1971)." Brief for Respondents 1–2, n. 1.

[3] Section 7602 reads:

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

including the Trust Agreement" for the period 1970 through 1972 and also "all deeds, options, correspondence, closing statements and sellers statements, escrows, and tax bills pertaining to all property held in the trust at any time during" that period. App. 9–16. Respondent Joseph W. Lang, a vice president of the bank, appeared in response to the summonses but, on advice of counsel, refused to produce any of the materials requested. Brief for Respondents 2.

The United States and Olivero, pursuant to §§ 7402 (b) and 7604 (a) of the Code, 26 U. S. C. §§ 7402 (b) and 7604 (a),[4] then petitioned the United States District Court for the Northern District of Illinois for enforcement of the summonses. App. 5. This was on November 11, 1975. Olivero testified that when the petition was filed he had not determined whether criminal charges were justified and had not made any report or recommendation about the case to his superiors. *Id.,* at 30. It was alleged in the petition and in an incorporated exhibit that the requested materials were necessary for the determination of the tax liability of Gattuso for the years in question and that the information contained in the documents was not in the possession of the petitioners. *Id.,* at 7, 17–18. The District Court entered an order to show cause, *id.,* at 19, and respondents answered through counsel, who also represented Gattuso. *Id.,* at 20–22.

---

[4] Section 7402 (b) states:

"If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data."

Section 7604 (a) reads:

"If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data."

At the ensuing hearing and in a post-hearing brief, respondents argued that Olivero's investigation was "purely criminal" in nature. *Id.*, at 82. Gregory J. Perry, a lawyer specializing in federal taxation and employed by the same law firm that filed the answer, testified that in June 1975 Olivero told him that the Gattuso investigation "was strictly related to criminal violations of the Internal Revenue Code." *Id.*, at 52. Respondents conceded that they bore the burden of proving that enforcement of the summonses would abuse the court's process, but they contended that they did not have to show "that there is no civil purpose to the Summons." *Id.*, at 87. Instead, they urged that their burden was to show that the summonses were not issued in good faith because "the investigation is solely for the purpose of gathering evidence for use in a criminal prosecution." *Id.*, at 77.

The District Court agreed with respondents' contentions. Although at the hearing the court seemed to recognize "that in any criminal investigation there's always a probability of civil tax liability," *id.*, at 61, it focused its attention on the purpose of Special Agent Olivero:

> "I'll say now that I heard nothing in Agent Olivero's testimony to suggest that the thought of a civil investigation ever crossed his mind.

> .  .  .  .  .

> "Now, unless I find something in the in camera inspection [of the IRS case file] that gives more support to the Government position than the Agent's testimony did, it would be my conclusion that he was at all times involved in a criminal investigation, at least in his own mind." [5]
> *Id.*, at 62.

---

[5] The District Court was aware of and recognized the Government's contention that the individual agent's motive in the investigation was not dispositive:

"The COURT: . . . [U]nder your theory any criminal investigation would

In its written memorandum, the District Court noted that *Donaldson* permitted the use of an IRS summons issued in good faith and prior to a recommendation for criminal prosecution. Relying on dictum in *Reisman* v. *Caplin,* 375 U. S. 440, 449 (1964), however, the court said that it was an improper use of the summons "to serve it solely for the purpose of obtaining evidence for use in a criminal prosecution." 76–1 USTC, at 84,072, 37 AFTR 2d, at 76–1240. If, at the time of its issuance, the summons served this proscribed purpose, the court concluded, the absence of a formal criminal recommendation was irrelevant, the summons was not issued in good faith, and enforcement was precluded. The court then held:

> "It is apparent from the evidence that Special Agent John F. Olivero in his investigative activities had focused upon the possible criminal activities of John Gattuso, and was conducting his investigation solely for the purpose of unearthing evidence of criminal conduct by Mr. Gattuso." *Id.,* at 84,073, 37 AFTR 2d, at 76–1240.

The United States Court of Appeals for the Seventh Circuit affirmed. 554 F. 2d 302 (1977). It concluded that the District Court correctly had included the issue of criminal purpose within the good-faith inquiry:

> "[T]he use of an administrative summons solely for

___

not really be one until they closed it because there was always a possibility of a civil liability.

. . . . .

"If that's the law, you're in trouble, Mr. Cushner [counsel for respondents].

. . . . .

"I think it boils down to an issue of law so it's the cases really that I'm interested in plus any further clues I may find in the in camera inspection of the investigative file." App. 61–62.

The court agreed to inspect the IRS investigative file *in camera* after it refused to permit respondents to inspect the file. *Id.,* at 50–51, 61–62.

criminal purposes is a quintessential example of bad faith. . . .

. . . . .

"We note that the district court formulated its factual finding by use of the expression 'sole criminal purpose' rather than by a label such as 'bad faith.' We find no basis for reversible error in that verbal formulation. The district court grasped the vital core of *Donaldson* and rendered its factual finding consistently therewith." *Id.,* at 309.

The Court of Appeals further decided that the District Court had reached a factual, rather than a legal, conclusion when it found the summonses to have been issued solely for a criminal prosecution. *Id.,* at 305. Appellate review, accordingly, was limited to application of the clearly-erroneous standard. *Id.,* at 306. Although the Court of Appeals noted that Olivero had testified about the existence of a civil purpose for the investigation, the court said that "the record establishes that the district court did not believe him." *Id.,* at 309. The appellate court could not reverse the trial court's judgment, it said, because it was "not left with a firm and definite conviction that a mistake [had] been made." *Id.,* at 306.

Because of the importance of the issue in the enforcement of the internal revenue laws, and because of conflict among the Courts of Appeals concerning the scope of IRS summons authority under § 7602,[6] we granted certiorari. 434 U. S. 996 (1977).

---

[6] Compare *United States* v. *Hodge & Zweig,* 548 F. 2d 1347, 1350–1351 (CA9 1977); *United States* v. *Zack,* 521 F. 2d 1366, 1368 (CA9 1975); *United States* v. *McCarthy,* 514 F. 2d 368, 374–375 (CA3 1975); *United States* v. *Weingarden,* 473 F. 2d 454, 460 (CA6 1973); *United States* v. *Wall Corp.,* 154 U. S. App. D. C. 309, 311, 475 F. 2d 893, 895 (1972); and *United States* v. *Billingsley,* 469 F. 2d 1208, 1210 (CA10 1972), with *United States* v. *Morgan Guaranty Trust Co.,* 572 F. 2d 36, 41–42 (CA2 1978); and *United States* v. *Troupe,* 438 F. 2d 117, 119 (CA8 1971),

II

In *Donaldson* v. *United States,* 400 U. S. 517 (1971), an IRS special agent issued summonses to a taxpayer's putative former employer and its accountant for the production of the employer's records of the taxpayer's employment and compensation. When the records were not forthcoming, the IRS petitioned for the enforcement of the summonses. The taxpayer intervened and eventually appealed the enforcement order. This Court addressed the taxpayer's contention that the summonses were unenforceable because they were issued in aid of an investigation that could have resulted in a criminal charge against the taxpayer. His argument there, see *id.,* at 532, was based on the following dictum in *Reisman* v. *Caplin,* 375 U. S., at 449:

> "[T]he witness may challenge the summons on any appropriate ground. This would include, as the circuits have held, the defenses that the material is sought for the improper purpose of obtaining evidence for use in a criminal prosecution, *Boren* v. *Tucker,* 239 F. 2d 767, 772–773 . . . ."

In the light of the citation to *Boren,*[7] the Court in *Donaldson* concluded that the dictum referred and was applicable to "the situation of a pending criminal charge or, at most, of an investigation solely for criminal purposes." 400 U. S., at 533.

---

regarding the conflict about whether the recommendation for criminal prosecution is dispositive of the so-called criminal purpose issue.

Compare *United States* v. *Hodge & Zweig,* 548 F. 2d, at 1351; and *United States* v. *Billingsley,* 469 F. 2d, at 1210, with *United States* v. *Lafko,* 520 F. 2d 622, 625 (CA3 1975), regarding the conflict about whether the criminal recommendation from the IRS to the Department of Justice or the recommendation from the special agent to his superiors is important in the enforcement inquiry.

[7] In *Boren* v. *Tucker,* 239 F. 2d 767, 772–773 (1956), the Ninth Circuit distinguished *United States* v. *O'Connor,* 118 F. Supp. 248 (Mass. 1953), which involved an investigation of a taxpayer already under indictment.

Discerning the meaning of the brief *Reisman* dictum, however, did not resolve for the Court the question posed by *Donaldson*. The validity of the summonses depended ultimately on whether they were among those authorized by Congress.[8] Having reviewed the statutory scheme, 400 U. S., at 523–525, the Court concluded that Congress had authorized the use of summonses in investigating potentially criminal conduct. The statutory history, particularly the use of summonses under the Internal Revenue Code of 1939,[9] supported this conclusion, as did consistent IRS practice and decisions concerning effective enforcement of other comparable federal statutes.[10] The Court saw no reason to force the Service to choose either to forgo the use of congressionally authorized summonses or to abandon the option of recommending criminal prosecutions to the Department of Justice.[11] As long as the summonses were issued in good-faith pursuit of the congressionally authorized purposes, and prior to any recommendation to the Department for prosecution, they were enforceable. *Id.*, at 536.

## III

The present case requires us to examine the limits of the good-faith use of an Internal Revenue summons issued under § 7602. As the preceding discussion demonstrates, *Donaldson* does not control the facts now before us. There, the taxpayer had argued that the mere potentiality of criminal prosecution should have precluded enforcement of the summons. 400 U. S., at 532. Here, on the other hand, the District Court

---

[8] The Court had concluded earlier that the summoning of the employer's and the accountant's records for an investigation of the taxpayer did not violate the constitutional rights of any of them. 400 U. S., at 522.

[9] See §§ 3614, 3615, 3616, and 3654 of the 1939 Code, 53 Stat. 438–440, 446.

[10] See *United States* v. *Kordel*, 397 U. S. 1, 11 (1970) (Federal Food, Drug, and Cosmetic Act enforcement), citing *Standard Sanitary Mfg. Co.* v. *United States*, 226 U. S. 20, 51–52 (1912) (Sherman Act enforcement).

[11] See Part III–B and n. 15, *infra*.

found that Special Agent Olivero was investigating Gattuso "solely for the purpose of unearthing evidence of criminal conduct." 76–1 USTC, at 84,073, 37 AFTR 2d, at 76–1240. The question then becomes whether this finding necessarily leads to the conclusion that the summonses were not issued in good-faith pursuit of the congressionally authorized purposes of § 7602.

## A

The Secretary of the Treasury and the Commissioner of Internal Revenue are charged with the responsibility of administering and enforcing the Internal Revenue Code. 26 U. S. C. §§ 7801 and 7802. Congress, by § 7601 (a), has required the Secretary to canvass revenue districts to "inquire after and concerning all persons therein who may be liable to pay any internal revenue tax." With regard to suspected fraud, these duties encompass enforcement of both civil and criminal statutes. The willful submission of a false or fraudulent tax return may subject a taxpayer not only to criminal penalties under §§ 7206 and 7207 of the Code, but, as well, to a civil penalty, under § 6653 (b), of 50% of the underpayment. And § 6659 (a) provides that the civil penalty shall be considered as part of the tax liability of the taxpayer. Hence, when § 7602 permits the use of a summons "[f]or the purpose of ascertaining the correctness of any return, . . . determining the liability of any person for any internal revenue tax . . . , or collecting any such liability," it necessarily permits the use of the summons for examination of suspected tax fraud and for the calculation of the 50% civil penalty. In *Donaldson,* 400 U. S., at 535, we clearly noted that § 7602 drew no distinction between the civil and the criminal aspects; that it "contains no restriction"; that the corresponding regulations were "positive"; and that there was no significance, "for civil as compared with criminal purposes, at the point of a special agent's appearance." The Court then upheld the use of the summonses even though fraudulent conduct carried the poten-

tial of criminal liability. The Court repeated this emphasis in *Couch* v. *United States,* 409 U. S. 322, 326 (1973):

"It is now undisputed that a special agent is authorized, pursuant to 26 U. S. C. § 7602, to issue an Internal Revenue summons in aid of a tax investigation with civil and possible criminal consequences."

This result is inevitable because Congress has created a law enforcement system in which criminal and civil elements are inherently intertwined. When an investigation examines the possibility of criminal misconduct, it also necessarily inquires about the appropriateness of assessing the 50% civil tax penalty.[12]

---

[12] The interrelated nature of the civil and criminal investigative functions is further demonstrated by the organization and functioning of the IRS. Pursuant to 26 CFR § 601.107 (1977), each revenue district has an Intelligence Division, "whose mission is to encourage and achieve the highest possible degree of voluntary compliance with the internal revenue laws." This purpose is implemented by "the investigation of possible criminal violations of such laws and the recommendation (when warranted) of prosecution and/or assertion of the 50 percent ad valorem addition to the tax." *Ibid.* See generally Internal Revenue Service Organization and Functions §§ 1113.563, 1114.8, and 1118.6, 39 Fed. Reg. 11572, 11581, 11601, and 11607 (1974).

In its Manual for employees, the IRS instructs that the jurisdiction of the Intelligence Division includes all civil penalties except those related to the estimated income tax. Internal Revenue Manual, ch. 4500, § 4561 (CCH 1976). The Manual adds:

"*Intelligence features* are those activities of developing and presenting admissible evidence required to prove criminal violations and the ad valorem penalties for civil fraud, negligence and delinquency (except those concerning tax estimations) for all years involved in cases jointly investigated to completion." *Id.,* § 4565.31 (4).

The Manual also contains detailed instructions for coordination between special agents and revenue agents during investigations of tax fraud. *E. g., id.,* § 4563.431 (1978), and §§ 4565.22, 4565.32, 4565.41–4565.44 (1976).

Statistics for the fiscal year 1976 show that the Intelligence Division has a substantially greater involvement with civil fraud than with criminal

The legislative history of the Code supports the conclusion that Congress intended to design a system with interrelated criminal and civil elements. Section 7602 derives, assertedly without change in meaning,[13] from corresponding and similar provisions in §§ 3614, 3615, and 3654 of the 1939 Code. By § 3614 (a) the Commissioner received the summons authority "for the purpose of ascertaining the correctness of any return or for the purpose of making a return where none has been made." Section 3615 (b)(3) authorized the issuance of a summons "[w]henever any person who is required to deliver a monthly or other return of objects subject to tax delivers any return which, in the opinion of the collector, is erroneous, false, or fraudulent, or contains any undervaluation or understatement." Section 3654 (a) stated the powers and duties of the collector:

> "Every collector within his collection district shall see that all laws and regulations relating to the collection of internal revenue taxes are faithfully executed and complied with, and shall aid in the prevention, detection, and punishment of any frauds in relation thereto. For such purposes, he shall have power to examine all persons, books, papers, accounts, and premises . . . and to summon any person to produce books and papers . . . and to compel compliance with such summons in the same manner as provided in section 3615."

Under § 3616 punishment for any fraud included both fine and imprisonment. The 1939 Code, therefore, contemplated the use of the summons in an investigation involving suspected

---

fraud. Of 8,797 full-scale tax fraud investigations in that year, only 2,037 resulted in recommendations for prosecution. The 6,760 cases not recommended involved approximately $11 million in deficiencies and penalties. See 1976 Annual Report of the Commissioner of Internal Revenue 33, 61, 152.

[13] See H. R. Rep. No. 1337, 83d Cong., 2d Sess., A436 (1954); S. Rep. No. 1622, 83d Cong., 2d Sess., 617 (1954).

criminal conduct as well as behavior that could have been disciplined with a civil penalty.[14]

In short, Congress has not categorized tax fraud investigations into civil and criminal components. Any limitation on the good-faith use of an Internal Revenue summons must reflect this statutory premise.

B

The preceding discussion suggests why the primary limitation on the use of a summons occurs upon the recommendation of criminal prosecution to the Department of Justice. Only at that point do the criminal and civil aspects of a tax fraud case begin to diverge. See *United States* v. *Hodge & Zweig,* 548 F. 2d 1347, 1351 (CA9 1977); *United States* v. *Billingsley,* 469 F. 2d 1208, 1210 (CA10 1972). We recognize, of course, that even upon recommendation to the Justice Department, the civil and criminal elements do not separate completely. The Government does not sacrifice its interest in unpaid taxes

---

[14] Internal Revenue officials received similar summons authority in Revenue Acts prior to the 1939 Code. See, *e. g.,* Revenue Act of 1918, § 1305, 40 Stat. 1142; Tariff Act of Oct. 3, 1913, § II ¶ I, 38 Stat. 178–179; Act of June 30, 1864, § 14, 13 Stat. 226.

The interrelated nature of fraud investigations thus was apparent as early as 1864. Section 14 of the 1864 Act permitted the issuance of a summons to investigate a suspected fraudulent return. It also prescribed a 100% increase in valuation as a civil penalty for falsehood. Section 15 established the criminal penalties for such conduct. Four years later, when Congress created the position of district supervisor, that official received similar summons authority. Act of July 20, 1868, § 49, 15 Stat. 144–145; see Cong. Globe, 40th Cong., 2d Sess., 3450 (1868). The federal courts enforced these summonses when they were issued in good faith and in compliance with instructions from the Commissioner. See *In re Meador,* 16 F. Cas. 1294, 1296 (No. 9,375) (ND Ga. 1869); *Stanwood* v. *Green,* 22 F. Cas. 1077, 1079 (No. 13,301) (SD Miss. 1870) ("it being understood that this right upon the part of the supervisor extends only to such books and papers as relate to their banking operations, and are connected with the internal revenue of the United States").

just because a criminal prosecution begins. Logically, then, the IRS could use its summons authority under § 7602 to uncover information about the tax liability created by a fraud regardless of the status of the criminal case. But the rule forbidding such is a prophylactic intended to safeguard the following policy interests.

A referral to the Justice Department permits criminal litigation to proceed. The IRS cannot try its own prosecutions. Such authority is reserved to the Department of Justice and, more particularly, to the United States Attorneys. 28 U. S. C. § 547 (1). Nothing in § 7602 or its legislative history suggests that Congress intended the summons authority to broaden the Justice Department's right of criminal litigation discovery or to infringe on the role of the grand jury as a principal tool of criminal accusation. Accord, *United States* v. *Morgan Guaranty Trust Co.*, 572 F. 2d 36 (CA2 1978); *United States* v. *Weingarden*, 473 F. 2d 454, 458–459 (CA6 1973); *United States* v. *O'Connor*, 118 F. Supp. 248, 250–251 (Mass. 1953); see *Donaldson* v. *United States*, 400 U. S., at 536; cf. *Abel* v. *United States*, 362 U. S. 217, 226 (1960). The likelihood that discovery would be broadened or the role of the grand jury infringed is substantial if post-referral use of the summons authority were permitted. For example, the IRS, upon referral, loses its ability to compromise both the criminal and the civil aspects of a fraud case. 26 U. S. C. § 7122 (a). After the referral, the authority to settle rests with the Department of Justice. Interagency cooperation on the calculation of the civil liability is then to be expected and probably encourages efficient settlement of the dispute. But such cooperation, when combined with the inherently intertwined nature of the criminal and civil elements of the case, suggests that it is unrealistic to attempt to build a partial information barrier between the two branches of the executive. Effective use of information to determine civil liability would inevitably result in criminal discovery.

The prophylactic restraint on the use of the summons effectively safeguards the two policy interests while encouraging maximum interagency cooperation.[15]

## C

Prior to a recommendation for prosecution to the Department of Justice, the IRS must use its summons authority in good faith. *Donaldson* v. *United States,* 400 U. S., at 536; *United States* v. *Powell,* 379 U. S. 48, 57–58 (1964). In *Powell,* the Court announced several elements of a good-faith exercise:

> "[The Service] must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's

---

[15] The Third Circuit has suggested that our reference in *Donaldson* to the recommendation for criminal prosecution ("We hold that under § 7602 an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution," 400 U. S., at 536) intended to draw a line at the recommendation to the Service's district office from the special agent, rather than at the recommendation from the Service to the Justice Department. *United States* v. *Lafko,* 520 F. 2d, at 625. This misread our intent. Given the interrelated criminal/civil nature of tax fraud investigation whenever it remains within the jurisdiction of the Service, and given the utility of the summons to investigate civil tax liability, we decline to impose the prophylactic restraint on the summons authority any earlier than at the recommendation to the Department of Justice. We cannot deny that the potential for expanding the criminal discovery rights of the Justice Department or for usurping the role of the grand jury exists at the point of the recommendation by the special agent. But we think the possibilities for abuse of these policies are remote before the recommendation to Justice takes place and do not justify imposing an absolute ban on the use of the summons before that point. Earlier imposition of the ban, given the balance of policies and civil law enforcement interests, would unnecessarily hamstring the performance of the tax determination and collection functions by the Service.

possession, and that the administrative steps required by the Code have been followed . . . . [A] court may not permit its process to be abused. Such an abuse would take place if the summons had been issued · for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Ibid.* (footnote omitted).

A number of the Courts of Appeals, including the Seventh Circuit in this case, 554 F. 2d, at 309, have said that another improper purpose, which the Service may not pursue in good faith with a summons, is to gather evidence solely for a criminal investigation.[16] The courts have based their conclusions in part on *Donaldson's* explanation of the *Reisman* dictum. The language of *Donaldson,* however, must be read in the light of the recognition of the interrelated criminal/civil nature of a tax fraud inquiry. For a fraud investigation to be solely criminal in nature would require an extraordinary departure from the normally inseparable goals of examining whether the basis exists for criminal charges and for the assessment of civil penalties.

In this case, respondents submit that such a departure did indeed occur because Special Agent Olivero was interested only in gathering evidence for a criminal prosecution. We disagree. The institutional responsibility of the Service to calculate and to collect civil fraud penalties and fraudulently reported or unreported taxes is not necessarily overturned by a single agent who attempts to build a criminal case. The

---

[16] See, *e. g., United States* v. *Hodge & Zweig,* 548 F. 2d, at 1350, 1351; *United States* v. *Zack,* 521 F. 2d, at 1368; *United States* v. *Lafko,* 520 F. 2d, at 625; *United States* v. *McCarthy,* 514 F. 2d, at 374–375; *United States* v. *Theodore,* 479 F. 2d 749, 753 (CA4 1973); *United States* v. *Weingarden,* 473 F. 2d, at 459; *United States* v. *Wall Corp.,* 154 U. S. App. D. C., at 311, 475 F. 2d, at 895.

review process over and above his conclusions is multilayered and thorough. Apart from the control of his immediate supervisor, the agent's final recommendation is reviewed by the district chief of the Intelligence Division, 26 CFR §§ 601.107 (b) and (c) (1977); Internal Revenue Manual, ch. 9600, §§ 9621.1, 9622.1, 9623 (CCH 1977); see *Donaldson* v. *United States,* 400 U. S., at 534. The Office of Regional Counsel also reviews the case before it is forwarded to the National Office of the Service or to the Justice Department. 26 CFR § 601.107 (c) (1977); Internal Revenue Service Organization and Functions § 1116 (3), 39 Fed. Reg. 11602 (1974); Internal Revenue Manual, ch. 9600, §§ 9624, 9631.2, 9631.4 (CCH 1977). If the Regional Counsel and the Assistant Regional Commissioner for Intelligence disagree about the disposition of a case, another complete review occurs at the national level centered in the Criminal Tax Division of the Office of General Counsel. Internal Revenue Service Organization and Functions § 1113.-(11) 22, 39 Fed. Reg. 11599 (1974); Internal Revenue Manual, ch. 9600, § 9651 (1) (CCH 1977). Only after the officials of at least two layers of review have concurred in the conclusion of the special agent does the referral to the Department of Justice take place. At any of the various stages, the Service can abandon the criminal prosecution, can decide instead to assert a civil penalty, or can pursue both goals. While the special agent is an important actor in the process, his motivation is hardly dispositive.

It should also be noted that the layers of review provide the taxpayer with substantial protection against the hasty or overzealous judgment of the special agent. The taxpayer may obtain a conference with the district Intelligence Division officials upon request or whenever the chief of the Division determines that a conference would be in the best interests of the Government. 26 CFR § 601.107 (b)(2) (1977); Internal Revenue Manual, ch. 9300, § 9356.1 (CCH 1977). If prosecution has been recommended, the chief notifies the taxpayer of

the referral to the Regional Counsel. 26 CFR § 601.107 (c) (1977); Internal Revenue Manual, ch. 9300, § 9355 (CCH 1977).

As in *Donaldson*, then, where we refused to draw the line between permissible civil and impermissible criminal purposes at the entrance of the special agent into the investigation, 400 U. S., at 536, we cannot draw it on the basis of the agent's personal intent. To do so would unnecessarily frustrate the enforcement of the tax laws by restricting the use of the summons according to the motivation of a single agent without regard to the enforcement policy of the Service as an institution. Furthermore, the inquiry into the criminal enforcement objectives of the agent would delay summons enforcement proceedings while parties clash over, and judges grapple with, the thought processes of each investigator.[17] See *United States* v. *Morgan Guaranty Trust Co.*, 572 F. 2d 36 (CA2 1978). This obviously is undesirable and unrewarding. As a result, the question whether an investigation has solely criminal purposes must be answered only by an examination of the institutional posture of the IRS. Contrary to the assertion of respondents, this means that those opposing enforcement of a summons do bear the burden to disprove the actual existence of a valid civil tax determination or collection purpose by the Service. After all, the purpose of the good-faith inquiry is to determine whether the agency is honestly pursuing the goals of § 7602 by issuing the summons.

Without doubt, this burden is a heavy one. Because criminal and civil fraud liabilities are coterminous, the Service rarely will be found to have acted in bad faith by pursuing the former. On the other hand, we cannot abandon this aspect of the good-faith inquiry altogether.[18] We shall not countenance

---

[17] We recognize, of course, that examination of agent motive may be necessary to evaluate the good-faith factors of *Powell*, for example, to consider whether a summons was issued to harass a taxpayer.

[18] The dissent would abandon this aspect of the good-faith inquiry. It would permit the IRS to use the summons authority solely for criminal

delay in submitting a recommendation to the Justice Department when there is an institutional commitment to make the referral and the Service merely would like to gather additional evidence for the prosecution. Such a delay would be tantamount to the use of the summons authority after the recommendation and would permit the Government to expand its criminal discovery rights. Similarly, the good-faith standard will not permit the IRS to become an information-gathering agency for other departments, including the Department of Justice, regardless of the status of criminal cases.[19]

---

investigation. It reaches this conclusion because it says the Code contains no limitation to prevent such use. Its argument reveals a fundamental misunderstanding about the authority of the IRS. The Service does not enjoy inherent authority to summon production of the private papers of citizens. It may exercise only that authority granted by Congress. In § 7602 Congress has bestowed upon the Service the authority to summon production for four purposes only: for "ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability." Congress therefore intended the summons authority to be used to aid the determination and collection of taxes. These purposes do not include the goal of filing criminal charges against citizens. Consequently, summons authority does not exist to aid criminal investigations solely. The error of the dissent is that it seeks a limit on the face of the statute when it should seek an affirmative grant of summons authority for purely criminal investigations. We have made that search and could uncover nothing in the Code or its legislative history to suggest that Congress intended to permit exclusively criminal use of summonses. As a result, the IRS employs its authority in good faith when it pursues the four purposes of § 7602, which do not include aiding criminal investigations solely.

[19] To the limited extent that the institutional good faith of the Service with regard to criminal purpose may be questioned before any recommendation to the Department of Justice, our position on this issue necessarily rejects the Government's argument that prerecommendation enforcement of summonses must meet only the *Powell* elements of good faith. We have concluded that the Government's contention fails to recognize the essence of the good-faith inquiry. The *Powell* elements were not intended as an exclusive statement about the meaning of good faith. They were examples

## D

In summary, then, several requirements emerge for the enforcement of an IRS summons.[20]   First, the summons must be issued before the Service recommends to the Department of Justice that a criminal prosecution, which reasonably would relate to the subject matter of the summons, be undertaken. Second, the Service at all times must use the summons authority in good-faith pursuit of the congressionally authorized purposes of § 7602.   This second prerequisite requires the Service to meet the *Powell* standards of good faith.   It also requires that the Service not abandon in an institutional sense, as explained in Parts III–A and III–C above, the pursuit of civil tax determination or collection.

## IV

On the record before us, respondents have not demonstrated sufficient justification to preclude enforcement of the IRS summonses.   No recommendation to the Justice Department for criminal prosecution has been made.   Of the *Powell* criteria, respondents challenge only one aspect of the Service's showing: They suggest that Olivero already may possess the evidence requested in the summonses.   Brief for Respondents 16–19.   Although the record shows that Olivero had uncovered the names and identities of the LaSalle National Bank land trusts, it does not show that the Service knows the value of the trusts or their income or the allocation of interests therein. Because production of the bank's complete records on the trusts reasonably could be expected to reveal part or all of this information, which would be material to the computation

---

of agency action not in good-faith pursuit of the congressionally authorized purposes of § 7602.   The dispositive question in each case, then, is whether the Service is pursuing the authorized purposes in good faith.

[20] These requirements are not intended to be exclusive.   Future cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process.

of Gattuso's tax liability, the *Powell* criteria do not preclude enforcement.  Finally, the District Court refused enforcement because it found that Olivero's personal motivation was to gather evidence solely for a criminal prosecution.  The court, however, failed to consider whether the Service in an institutional sense had abandoned its pursuit of Gattuso's civil tax liability.[21]  The Court of Appeals did not require that inquiry. On the record presently developed, we cannot conclude that such an abandonment has occurred.

The judgment of the Court of Appeals is therefore reversed with instructions to that court to remand the case to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE, MR. JUSTICE REHNQUIST, and MR. JUSTICE STEVENS join, dissenting.

This case is here only because of judicial misreadings of a passage in the Court's opinion in *Donaldson* v. *United States*, 400 U. S. 517, 533.  That passage has been read by the federal courts, in this case and in others, to mean that a sum-

---

[21] Respondents argue that the District Court made a factual finding when it concluded that the summonses were issued solely to gather evidence for a criminal prosecution.  They then submit that the District Court's decision may be overturned only if this Court holds this finding to be clearly erroneous.  Several Courts of Appeals have discussed the factual and legal issues that lurk in summons enforcement proceedings.  Compare *United States* v. *Zack*, 521 F. 2d, at 1367–1368; *United States* v. *National State Bank*, 454 F. 2d 1249, 1252 (CA7 1972); *Boren* v. *Tucker*, 239 F. 2d, at 773, with *United States* v. *Weingarden*, 473 F. 2d, at 460.  Whether the issue of the Service's good faith generally poses a factual question, or a legal and factual one, or a legal question, is not necessarily presented in the case now before the Court, and we do not reach it.  The lower courts employed an incorrect legal standard to measure good faith when they limited their consideration to the personal motivation of Special Agent Olivero.  In this case, then, a legal error compels reversal.

mons under § 7602 of the Internal Revenue Code, 26 U. S. C. § 7602, is improper if issued in aid of an investigation solely for criminal purposes.[1] Yet the statute itself contains no such limitation, and the *Donaldson* opinion in fact clearly stated that there are but two limits upon enforcement of such a summons: It must be "issued in good faith and prior to a recommendation for criminal prosecution." 400 U. S., at 536. I adhere to that view.

The Court concedes that the task of establishing the "purpose" of an individual agent is "undesirable and unrewarding." *Ante,* at 316. Yet the burden it imposes today—to discover the "institutional good faith" of the entire Internal Revenue Service—is, in my view, even less desirable and less rewarding. The elusiveness of "institutional good faith" as described by the Court can produce little but endless discovery proceedings and ultimate frustration of the fair administration of the Internal Revenue Code. In short, I fear that the Court's new criteria will prove wholly unworkable.

Earlier this year the Court of Appeals for the Second Circuit had occasion to deal with the issue now before us in the case of *United States* v. *Morgan Guaranty Trust Co.,* 572 F. 2d 36. Judge Friendly's perceptive opinion for his court in that case read the *Donaldson* opinion correctly: This Court was there "laying down an objective test, 'prior to a recommendation for criminal prosecution,' that would avoid a need for determining the thought processes of special agents; and . . . the 'good faith' requirement of the holding related to such wholly different matters as those mentioned in" the case of *United States* v. *Powell,* 379 U. S. 48.[2] "Such a view would . . . be

---

[1] See *ante,* at 305–306, n. 6.

[2] As Judge Friendly pointed out, this Court's *Powell* opinion simply declared that a court may not permit its process in enforcing a summons to be abused, and its examples of "abuse" were:

" 'Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him

consistent with the only rationale that has ever been offered for preventing an otherwise legitimate use of an Internal Revenue Service third party summons, namely that Congress could not have intended the statute to trench on the power of the grand jury or to broaden the Government's right to discovery in a criminal case . . . ."   572 F. 2d, at 41–42.

Instead of standing by the objective and comparatively bright-line test of *Donaldson,* as now clarified, the Court today further muddies the waters.  It does not even attempt to identify the source of the requirements it now adds to enforcement proceedings under §§ 7402 (b) and 7604 (a) of the Code. These requirements are not suggested by anything in the statutes themselves, and nobody suggests that they derive from the Constitution.  They are simply imposed by the Court from out of nowhere, and they seem to me unjustified, unworkable, and unwise.

I would reverse the judgment, not for further hearings in the District Court, but with instructions to order enforcement of the summons.

---

to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'   [379 U. S., at 58.]

"Nothing was said to indicate that an intention by the Commissioner to uncover criminal tax liability would reflect 'on the good faith' of the inquiry, and the rule of *ejusdem generis* would dictate the contrary."   572 F. 2d, at 40.