Abraham Poretz, Susan Mername, Ronald Cimino, Dept. of Justice, Philadelphia Strike Force, Philadelphia, Pa., for defendant.

## UNITED STATES of America

v.

## Carmen DI ORIO.

### Crim. No. CR. 79–82.

United States District Court, E. D. Pennsylvania.

Aug. 1, 1979.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District.Judge.

In this criminal tax case, the defendant has moved to suppress all evidence obtained by the government through use of summonses issued by Internal Revenue Service (IRS) agents pursuant to their authority under 26 U.S.C. § 7602. After conducting an evidentiary hearing and reviewing that testimony, as well as certain evidence that the Court subsequently ordered the government to produce, the Court denied the motion and files the following findings of fact and conclusions of law in support thereof.

*FINDINGS OF FACT*

1. In February 1975, the Chief of the Philadelphia Intelligence Division of the IRS received a memorandum from IRS agent Gerald J. Smith, who was the IRS representative to the Philadelphia Strike Force.[1] Financial and background information concerning the defendant was relayed

---

1. The Strike Force is a unit of the Justice Department's criminal division and it emphasizes prosecutions in the areas of organized crime and racketeering.

through the memorandum, which was submitted to the Intelligence Division for evaluation as to a possible tax investigation. The memorandum neither mentioned the Strike Force attorneys nor their recommendations with regard to the information. This memorandum was obtained by the Court pursuant to its order of July 24, 1979, and has been marked by the Court as C–1, an exhibit of the suppression hearing.

2. Upon receipt of the memorandum, the Chief of the Philadelphia Intelligence Division transmitted it to Special Agent Robert W. White, an agent assigned to the Intelligence Division's Strike Force group, for evaluation. After gathering background and tax related information about the defendant, Agent White concluded that a tax investigation for both criminal and civil purposes should be commenced. In an October 28, 1975 memorandum to the Chief of the Philadelphia Intelligence Division, White analyzed the information he had collected and requested that the defendant be approved as a Strike Force Target of the IRS and investigated for possible Title 26 violations in contravention of IRS laws. In accordance with its July 24, 1979 Order, the Court was furnished with this memorandum and it has been marked by the Court as suppression exhibit C–2.

3. The investigation was approved in November 1975, and was aimed at determining the civil tax liability and criminal responsibility of the defendant. Besides Special Agent White, Revenue Agent Kane was assigned to the investigation to assist in its accounting and auditing aspects.

4. Between February 1975, and February 1977, Special Agent White had six contacts with personnel or employees of the Philadelphia Strike Force which related to this case.

5. The first was on January 8, 1976, when Agent White sought profile and background information regarding the defendant from an individual responsible for the racketeer profile system.

6. At an August 24, 1976 meeting, White had his second contact with Strike Force personnel. Also present at that meeting were, among others, Revenue Agent Kane, the attorney in charge of the Philadelphia Strike Force, Joel Friedman, and an attorney on the Strike Force, Albert J. Wicks. Although background information concerning the defendant was discussed, the only new information that the IRS agents secured about the defendant was from an FBI memorandum which they were supplied. There is no evidence that any IRS agent disclosed information from their investigation to the Strike Force attorneys during the meeting, or that the attorneys in any way directed the agents as to how they should proceed in their tax investigation.

7. Another meeting with members of the Philadelphia Strike Force was held on November 18, 1976. Agents White and Kane sought additional background information about the defendant, and advice from the Strike Force attorneys concerning problems that they were encountering in obtaining a case file from the IRS Inspection Division. Although the attorneys gave the agents advice as to how to secure this file, they did not direct them as to how they should proceed. When asked why they sought advice from the Strike Force attorneys, rather than from IRS Regional Counsel, Agent White replied that "it was not set up that way," and that the Strike Force was where the investigation was being monitored. He explained that since the defendant was a strike force target, there was a Strike Force attorney who had the case on his inventory; although the attorney did not direct the IRS investigation, he was the attorney that the IRS agent could contact concerning any legal problems. There is no direct evidence that at this meeting the IRS agents disclosed to the Philadelphia Strike Force attorneys information about the defendant discovered through their investigation, and Agent White has denied that any such information was revealed.

8. The next encounter that Agent White had with the Philadelphia Strike Force was a brief one, occurring when on December 22, 1976, he telephoned attorney Albert J. Wicks and asked him to explain the differ-

ence between use and transactional immunity. The conversation lasted between one and two minutes.

9. A fifth contact was made with the Strike Force on January 4, 1977, when Special Agent White again phoned Wicks to ask for advice on how to obtain and inspect the case file that was in the possession of the IRS Inspection Division, and which included, *inter alia*, information obtained during a prior grand jury investigation.

10. Finally, on February 4, 1977, Agent White had his last contact with the Strike Force when he picked up the Inspection Division case file from the Strike Force which had obtained it for him. There was no discussion with Strike Force attorneys at that time.

11. Agent White made no memoranda of any of the meetings or contacts that he had with the Strike Force.

12. Between May 1976, and February 1977, Agent White issued twelve administrative summonses, all to banks or savings and loan institutions.

13. In February 1977, Agent White was transferred from the case and Special Agent Frank McLaughlin was assigned to it.

14. Between February 1977 and June 8, 1977, Agent McLauglin issued twelve administrative summonses to banks, automobile and aircraft dealers and a title company. During that time, he had no contact with the Strike Force attorneys.

15. No IRS administrative summonses were issued with reference to this case after June 8, 1977.

16. On August 16, 1977, Agent McLaughlin made a formal request for a Title 26 Grand Jury investigation. This request was approved by the Chief of the Philadelphia IRS Criminal Investigation Division on September 7, 1977, and forwarded to IRS Regional Counsel. The Department of Justice received Regional Counsel's request on October 27, 1977, and it was approved on November 29, 1977. The first grand jury subpoena was issued during March 1977.

17. Although Agent White had contacts with Strike Force personnel during the time when he was issuing summonses to banks and other financial institutions, the Court finds that he did not disclose information obtained through the summonses or otherwise gained in his investigation to the Strike Force attorneys. The Court bases this finding upon Agent White's testimony and the lack of evidence to the contrary.

18. The Court further finds that during that time the IRS agents were not acting under the direction of the Philadelphia Strike Force when conducting their tax investigation of the defendant. This finding is grounded upon the testimony of agents White and McLaughlin, which the Court does not believe was effectively impeached by the defense. Even though the initial information about the defendant was forwarded to the IRS through the Strike Force, there is no evidence of an initial recommendation for an investigation by the Strike Force or any indication that the Strike Force or the IRS intended the IRS investigation to be led or directed by Strike Force attorneys. The fact that the IRS agents had six contacts with Strike Force personnel concerning the investigation does not convince the Court that they were acting pursuant to the directions of the Strike Force. There were only two actual meetings with Strike Force attorneys, the first held ten months after the IRS investigation actually commenced, indicating that the IRS agents were not being supervised by the Strike Force. Rather, the evidence establishes that the Strike Force attorneys sought to aid the investigation by supplying the IRS agents with information obtained through previous Strike Force investigations that might be relevant to defendant's tax liability and by giving them legal advice as to how the agents could secure the case file from IRS Inspection Division. Although the Strike Force cooperated with the IRS by giving it information and advice, the Court accepts the witnesses' testimony that the investigation was controlled by the IRS and was not under the direction of the Strike Force.

19. The IRS investigation took over two years. But there is no evidence that this length of time was unreasonable given the apparent complexity of this net worth tax case or that it was taken solely to further a criminal investigation. The defendant did not ask the agents why the investigation took so long and the Court finds no evidence on which to find that it was for reasons other than to conduct a complicated tax investigation with both civil and criminal aspects.

20. At the time the summonses were issued, the IRS institutionally was committed to conducting a joint criminal and civil tax investigation. A special agent and a revenue agent were assigned to the case, evidence of interest in both criminal responsibility and civil tax liability. The special agents testified that they were interested in both facets of the investigation, which is consistent with their duties, as specified in Section 210 of the Handbook for Special Agents. Although the agents met or contacted Strike Force personnel on six occasions and received the information stimulating the investigation from the Strike Force, the Court is not convinced, given the contrary testimony and evidence, that the IRS was pursuing solely a criminal investigation.

21. From the evidence presented, the Court concludes that the summonses issued by the IRS agents before June 8, 1977, were in aid of both the civil and criminal tax investigation. Although the defendant was given the opportunity to fully question the agents and ask them about the purpose of each summons, he did not do so, and therefore, the Court accepts as true, the agents' testimony that each was, at least in part, issued to determine civil tax liability.

### CONCLUSIONS OF LAW

Based upon the above findings of fact, the Court concludes that the summonses issued by the IRS agents in this case prior to June 8, 1977, were issued in accordance with the requirements of law as outlined in *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), and further elaborated upon by the Court of Appeals in their series of opinions in *United States v. Genser*, 582 F.2d 292 (3d Cir. 1978), 595 F.2d 146, (3d Cir. 1979) 602 F.2d 69 (3d Cir. 1979).

In *LaSalle*, the Supreme Court held that IRS summonses were legally issued if they were issued before the IRS recommended criminal prosecution to the Department of Justice and if they were issued in "good faith pursuit of the congressionally authorized purposes of § 7602."[2] In this case, all the summonses were issued prior to the IRS request that a grand jury investigation commence under the Justice Department's supervision. Therefore, the issue is whether the summonses were issued in good faith pursuit of the purposes of Section 7602.

Although the question is framed in terms of "good faith," the Supreme Court in *LaSalle* recognized that to defeat a summons a defendant would have to show that the summons was issued in bad faith. Here, the defendant has failed to meet that burden. For example, he has not shown that the summonses were issued solely to aid a criminal investigation or that that was all that the IRS was pursuing. *See United States v. LaSalle National Bank, supra.* Nor has he established that the IRS was merely serving as a collector of information for other departments of the government or

2. Section 7602 reads, in pertinent part: "For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized— . . . (2) To summon the person liable for tax or required to perform or required to perform the act, or any officer or employee of such person, or any person having possession, custody or care of books of account containing entries relating to the business of the person liable for tax or require to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry . . . ."

that the IRS delayed its request for a grand jury investigation so that it could obtain additional information for a criminal investigation. *See United States v. LaSalle National Bank, supra.* In short, he has failed to present evidence of other indicators of bad faith. On the other hand, the evidence established that the summonses were issued, at least in part, to aid a civil tax investigation, which is one of the purposes of Section 7602. For these reasons, the Court was required to deny the defendant's motion to suppress.