UNITED STATES of America, Appellee,

v.

Hubert MICHAUD, Defendant, Appellant.

No. 88–1440.

United States Court of Appeals, First Circuit.

Heard Sept. 15, 1988.
Decided Oct. 31, 1988.

---

Richard O. Lessard with whom Joseph J. Rodio, Rodio & Ursillo, Ltd., William A. Dimitri, Jr., Providence, R.I., Lorraine L. Hansen, and L.L. Hansen Legal Profession-

al Association, Portsmouth, N.H., were on brief, for defendant, appellant.

Alan Hechtkopf, Tax Div., Dept. of Justice, with whom William S. Rose, Jr., Asst. Atty. Gen., Washington, D.C., Richard V. Wiebusch, U.S. Atty., Concord, N.H., Gary R. Allen and Robert E. Lindsay, Tax Div., Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before BOWNES and BREYER, Circuit Judges, and ATKINS,* Senior District Judge.

BREYER, Circuit Judge.

Hubert Michaud appeals his conviction for "willfully attempt[ing] ... to evade ... [income] tax" liability for the years 1980 and 1981. 26 U.S.C. § 7201 (1982). His appeal is based on governmental misconduct and insufficiency of the evidence. We affirm his conviction.

■ 1. The facts, as the jury might have found them, include the following:

a) In December 1980 Michaud, a businessman, donated a campground that he owned to the Life Science Church. He deducted about $86,000 on his 1980 income tax return, and about $106,000 on his 1981 return, which he claimed as the value of this contribution to a "charity."

b) The Life Science Church is not a tax exempt charitable organization. Its main objectives are not charitable in nature. *See* 26 U.S.C. § 501(c)(3) (1982). Life Science Church representatives have claimed that it offers a way to reduce personal income taxes. They have sold charters to individuals whom they have ordained as church ministers. They have told these individuals that they can take a vow of poverty and assign all their assets to the Church, thereby obtaining tax deductions of up to 50 percent of gross income. The government has convicted William Drexler, the Church's founder, of various tax related crimes.

c) Michaud and a business associate, Anthony Induisi, attended a promotional Church meeting during September 1980.

They paid the Church $7,200 and received charters and certificates making them ministers. Michaud then donated his campground to the Church, in December 1980. He did not conduct any religious services, nor did he engage in any other activity connected with the Church that one could reasonably describe as religious or charitable.

d) After donating the campground to the Church, Michaud continued to list the campground as his own on his financial statements. He mortgaged the campground to secure a note he gave a supplier. He took out insurance policies on the campground, listing himself as the named insured. He paid expenses of the campground. He continued to have his bookkeepers record the campground's expenses in the same books they used to keep the accounts of another campground he owned. (He later deducted these expenses, as expenses of the other campground, on his 1981 and 1982 tax returns.)

e) Michaud's tax accountant Adrian Gaspar told Michaud, both before and after Gaspar attended a meeting with Church promoters, that he did not see how Michaud could deduct donations to the Church. In effect, he told Michaud that the deduction could not be legal because a taxpayer cannot both retain a controlling interest in property and also deduct it as a charitable gift to a church. Gaspar prepared Michaud's 1980 tax return without the Church deduction, but Michaud then hired another accountant, Joszef Debreczini, to prepare his 1980 and 1981 returns with the deduction.

f) Michaud attended the Church promotional meetings with two business associates, Mayer Friedberg and Anthony Induisi. The former told Michaud he thought the Church was a scam and he would have nothing to do with it. Induisi did take a deduction for a Church donation in 1980, but later told Michaud (before Michaud filed his 1981 tax return) that Induisi's 1980 return was being audited because of this deduction, and that Drexler, the found-

* Of the Southern District of Florida, sitting by designation.

er of the Church, had been convicted of tax crimes.

Although Michaud disputed several of these facts, the jury could have rejected his contrary testimony and evidence. The facts, as presented, were more than sufficient to permit the jury to have found, beyond a reasonable doubt, that Michaud willfully tried to evade payment of his income taxes.

■ 2. Appellant argues that the district court should have directed an acquittal because of misconduct by the IRS agent who investigated his returns. He rests most of his misconduct claims on the way the IRS agent conducted the audit process.

a) On May 5, 1982, the IRS assigned its agent Darby Levy to audit Michaud's *1979* return (on which he had claimed a large deduction for other land donated to the state of New Hampshire). On June 4, 1982, Levy met with Michaud. Michaud says he told her he intended to take the Church deduction when he filed his next (1980) tax return (which he did not file until July 1982). He claims that Levy knew it would be illegal for him to take the Church deduction, but Levy did not warn him. One month later, in July 1982, Michaud filed his 1980 tax return, taking the Church deduction.

■ Michaud says that the IRS behaved improperly in June 1982 because Levy did not then warn him that he would not be able lawfully to take a Church deduction on his 1980 tax return (which he intended to file in July 1982). Even if we assume, however, that Michaud's characterization of his June 1982 meeting with Levy is correct, his claim of misconduct has no merit. As far as we know, no law, rule, or regulation obliges IRS agents to warn taxpayers not to take illegal deductions. Michaud does not (and could not) argue that the government induced him to commit a crime he was not predisposed to commit. *See United States v. Coady*, 809 F.2d 119, 122 (1st Cir.1987) (to raise an entrapment defense, defendant must make threshold showing that government agents "turned him from a righteous path to an iniquitous one"). A defendant who *is* predisposed to

commit a crime can claim a violation of due process only if the government's conduct is "outrageous." *United States v. Bradley*, 820 F.2d 3, 7 (1st Cir.1987). Michaud points to no facts suggesting that Levy's failure to warn him approaches the sort of trickery or active involvement in crime that might constitute outrageous misconduct. *See* United States v. Porter, *764 F.2d 1, 8 (1st Cir.1985) (collecting cases).*

■ b) In September 1982, Agent Levy wrote a note to herself. It says "start to write up fraud referral." In November 1982, Levy wrote another note to herself. It says "decide to wait on referral for multiple years." Levy met with Michaud both before and after she wrote these notes. On February 2, 1983, Levy was assigned to audit Michaud's 1980 return. On October 27, 1983, Levy discussed Michaud's Church deduction with him. (Levy says this was the first time she discussed it with him.) Between October 31 and November 4, 1983, Levy referred Michaud's 1979, 1980 and 1981 tax returns to the criminal investigation division of the IRS. A week later, on November 9, 1983, Levy met with Gaspar (Michaud's accountant) to obtain some relevant records.

Michaud says that Levy's notes show that she violated certain IRS regulations. Those regulations say that a tax examiner must "suspend ... her activities" when she discovers "a firm indication of fraud," and refer the case to the criminal division of the IRS for further investigation. IRS Manual (Audit) § 4565.21. Michaud points to Levy's September 1982 note about starting to write the fraud referral and her November 1982 note about deciding to wait for a multiple-year referral. He argues that they show she found "a firm indication of fraud" as early as September 1982, and that she violated the rules by continuing to investigate for another year, and by meeting with Michaud's accountant on November 4, 1983, a week after she referred the case for criminal investigation.

We doubt, however, that these facts show a violation of the IRS rules. The specific regulation at issue gives the agent

discretionary authority to decide when a suspicion of fraud is "firm." We must give considerable weight to an official's or agency's interpretation of their own regulations. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). And an interpretation that would not view these notes as indicating a sufficiently "firm" indication of fraud is not unreasonable; nor is it unreasonable to read the regulation as permitting the agent to contact the taxpayer's accountant to obtain relevant records a few days after she refers the case for criminal investigation.

■ Regardless, the law is clear that an IRS agent's violation of a regulation of this sort does not prevent prosecution and conviction of a defendant, nor does it require suppression of evidence. *United States v. Caceres,* 440 U.S. 741, 754–55, 99 S.Ct. 1465, 1473, 59 L.Ed.2d 733 (1979) (agency's violation of regulations that are not mandated by the constitution or by statute does not require suppression of evidence); *United States v. Irvine,* 699 F.2d 43, 46 (1st Cir.1983) (same); *Groder v. United States,* 816 F.2d 139, 142 (4th Cir.1987) (IRS Manual § 4565.21 is merely an internal agency rule, not a rule required by statute or one that confers a substantive right on taxpayers); *United States v. Kaatz,* 705 F.2d 1237, 1243 (10th Cir.1983) (violation of IRS audit handbook rules on fraud referral does not prove a violation of taxpayers' constitutional rights).

Michaud apparently believes that *United States v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) holds the contrary, but his reliance on *LaSalle* is misplaced. The Supreme Court in *LaSalle* wrote that a specific statutory provision, 26 U.S.C. § 7602(2) (1976), permitting the IRS to issue a civil summons, does not authorize it to issue a summons after it refers a case to the Department of Justice for a criminal prosecution. The Court, however, wrote only that the IRS cannot use its summons power for a *purely criminal* investigatory purpose; it held that the IRS *could* use its statutory civil summons power when its investigation had *both*

criminal and civil aspects. *Id.* at 316, 98 S.Ct. at 2367. The case before us is plainly different from *LaSalle* because it does not involve use of the statutory summons power, and it therefore raises none of the issues of interpreting 26 U.S.C. § 7602(2) that the *LaSalle* Court considered. Moreover, even were *LaSalle*'s discussion somehow applicable, Michaud has not shown that Levy's investigation was *purely criminal.* Thus, if *LaSalle* were to apply here at all, it suggests that use of a summons would have been *permissible.* For similar reasons, the other cases that Michaud cites, *United States v. Weiss,* 566 F.Supp. 1452 (C.D.Ca.1983), and *United States v. Dahlstrum,* 493 F.Supp. 966 (C.D. Ca.1980) are beside the point.

■ c) Michaud argues that Levy, during her investigations, asked him questions to ascertain his state of mind. Michaud apparently thinks such questioning is improper. But the regulations, and common sense, suggest that such questions are appropriate. *See* IRS Manual (Audit) § 4565.21 (permitting examiners to ask questions "which will resolve the question of the taxpayer's intent"); *cf.* ¶ 981 of the Audit Guidelines, IRS Manual § 4231 (warning examiners not to suspend an audit and make a fraud referral too soon, before the agent has "found sufficient evidence of intent.").

■ d) Michaud says that Levy recommended less severe treatment (no prosecution) for his business associate Induisi, who also took deductions for property given the Church, but whom the IRS has not prosecuted criminally. He seems to think this was improper. We can see possible reasons for distinguishing between Michaud and Induisi. Induisi deducted less money than did Michaud, and Induisi took the deduction for one year, not two. Regardless, the law does not require the IRS to treat similarly all who arguably engage in roughly similar conduct. Michaud has not made out a claim of selective prosecution. *See United States v. Benny,* 786 F.2d 1410, 1419 (9th Cir.), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986) (defendant must show that others similarly

situated have not been prosecuted, and that he was selected for prosecution for an impermissible reason).

3. Michaud points out that, during his trial, the prosecutor tried to ask a defense witness (former IRS employee John O'Brien, testifying about IRS practices) whether he had recently been the subject of a criminal investigation. Michaud says that this question was improper and that the court ought to have declared a mistrial or directed a verdict of acquittal. The problem with Michaud's argument, however, is that the trial court asked Michaud if he wanted a mistrial and he said that he did not. Subsequently, the court instructed the jury to disregard the prosecutor's question. Ordinarily, we do not allow a defendant who turns down an offer of a mistrial before the jury returns its verdict to have a second opportunity to seek a mistrial after he learns the jury decided against him. And, there is no special circumstance warranting other than ordinary treatment here. There was no deliberate prosecutorial effort to provoke a mistrial, *see United States v. Maccini*, 721 F.2d 840, 846 (1st Cir.1983), nor has there been any miscarriage of justice. *United States v. McNatt*, 842 F.2d 564, 566 (1st Cir.1988).

4. Michaud argues that the trial court should have directed an acquittal on the ground that he had a valid defense, namely that he relied upon the advice of a tax professional, his second accountant Debreczini. The district court did instruct the jury that

> reliance on the advice of a professional in the preparation of tax returns is a defense to the willful failure to comply with the tax law if there has been a complete disclosure of facts by the defendant to the professional.

Michaud does not complain that this (favorable) instruction is incorrect. Nor can he successfully contend that the evidence of reliance upon Debreczini's advice, tending to negate the element of willfullness, is so strong as to require a directed verdict of acquittal. Debreczini's testimony indicated that Michaud had not "complete[ly] disc-

los[ed the] ... the facts." He apparently did not know that Michaud continued to list the campground on his personal financial statements after donating it. Michaud himself said he did not remember whether he had told Debreczini that he had subsequently mortgaged the campground. Both these pieces of information would have helped Debreczini ascertain that Michaud was continuing to treat the property as his own after he said he had given it away. They were sufficient to have permitted the jury to reject Michaud's defense, under the instruction given. And, together with the evidence of willfullness mentioned at pp. 497–498, *supra,* they provided more than sufficient support for the jury's finding of a willful effort to evade payment of a tax.

The judgment of the district court is

AFFIRMED.