**UNITED STATES of America and John R. Cassie Jr., Plaintiffs,**

v.

**FIRST NATIONAL STATE BANK OF NEW JERSEY, Defendant,**

v.

**P. L. (taxpayer), Intervenor.**

**Civ. No. 78–3054.**

United States District Court,
D. New Jersey.

April 17, 1979.

Memorandum Order April 26, 1979.

Robert J. Del Tufo, U. S. Atty., by Eric L. Chase, Asst. U. S. Atty., Newark, N. J., for plaintiffs.

Herbert L. Zuckerman and Lawrence S. Horn, Newark, N. J., for intervenor.

No appearance for defendant.

## OPINION

BIUNNO, District Judge.

The combination of *U. S. v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the amendments made by the Tax Reform Act of 1976 to 26 U.S.C. § 7609, and the "Right to Financial Privacy Act of 1978", Pub.L. 95–630, § 1100, *et seq.,* effective March 10, 1979, among other factors, has generated extremely complex judicial problems in considering and deciding a large number of IRS summons enforcement cases which, before these new factors arose, were quite few or rare, and involved little time or effort.

*LaSalle* is important because it is the newest ruling by the Supreme Court in a line of cases marked particularly by *Reisman v. Caplan,* 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); *U. S. v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964) and *Donaldson v. U. S.,* 400 U. S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971).

In this Circuit, other pertinent decisions in the line or essentially parallel to it include *In re Grand Jury Proceedings* (Schofield), 486 F.2d 85 (CA–3, 1973), *U. S. v. McCarthy,* 514 F.2d 368 (CA–3, 1975), *U. S. v. Genser,* 582 F.2d 292 (CA–3, 1978), and after remand, 595 F.2d 146 (CA–3, 1979), (Nos. 76–2623/4, decided March 9, 1979).

Other pertinent decisions in various courts of other circuits include *Trapp v. Baptist,* (D–Ala., 1978) (CCH U.S. Tax Cases, 3/14/79, ¶ 9241); *U. S. v. Del Sandro,* 465 F.Supp. 1009 (D–Pa., 1979); *U. S. v. Bank of Monte Vista,* 451 F.Supp. 945 (D–Colo., 1978); *U. S. v. Shivlock,* 459 F.Supp. 1383 (D–Colo., 1978); *U. S. v. Chemical Bank,* 593 F.2d 451 (CA–2, 1979).

The facts briefly are that a series of IRS summonses were issued to a number of third-party record keepers in connection with an investigation of a specified taxpayer. As provided by the 1976 Act, notice of the summonses was given to the taxpayer who, as allowed by the Act, wrote the record keepers to instruct them not to comply,

a step which serves as an automatic stay without formal steps either before IRS or a court.

Thereafter, the United States and the special agent of IRS who had issued the summonses filed a series of "petitions" for enforcement, under 26 U.S.C. § 7604, one petition for each summons. With each one an order to show cause was submitted, which was issued with a return date. Taxpayer appeared and intervened in all the cases.

By stipulations of record at the hearing, it was established that there had not at that point been any referral by IRS to the Attorney General, the event chosen by the *LaSalle* court as the line of demarcation at which the intertwined civil and criminal aspects of an IRS investigation diverge.[1] It was also established that, on the strength of comments made by this court in *U. S. v. Garden State Nat'l Bank*, 465 F.Supp. 437 (D.N.J., 1979), Taxpayer (through a representative) asked IRS to meet and confer in an effort to negotiate a compromise of the civil aspects; no request was made to negotiate and compromise criminal aspects as well, see 26 U.S.C. § 7122(a). IRS declined to meet, because its investigation was not complete.

At this posture, the court continued the hearing to a new date by order conditioning the requested enforcement order on a good faith participation by IRS in negotiations aimed at arriving at a compromise. Claiming that the court lacked authority to specify that condition, IRS declined to comply. In so doing, it doubtless preserved the issue while discarding an opportunity to secure all the information it seeks via good faith negotiations which would in no way have restricted it in considering whether or not to refer the matter to the Attorney-General for criminal prosecution.

So much of the court's effort having proven unproductive, the court then undertook an inspection in camera of the IRS intraoffice memos, with the participation of the Assistant U.S. Attorney and the Special Agent to explain the various documents. A sealed transcript was prepared.

From that record, it appeared that the delay from when summonses were first issued to the time when the summons enforcement proceedings were filed was obviously attributable to uncertainties about the effect of the *LaSalle* decision, which came down about the time the first requests for enforcement were made. Draft boilerplate letters, evidently prepared locally and sent to IRS counsel for signature to authorize enforcement proceedings, did not mention *LaSalle* in the first group. The second group of drafts did.

All the drafts make reference to the requirement, in *Powell* and *McCarthy*, for a showing that IRS did not already have what it sought. In this group of cases, all of the third-party recordkeepers were of a kind which were required to file Form 1099 (information return) with IRS, and send a copy to the taxpayer. The in camera hearing established that for all third-party recordkeepers, IRS already had the Form 1099 information. For that reason, the court ruled that the enforcement order was not to reach retained copies of Form 1099.

The reasons for this limitation are obvious. As is well and widely known, IRS simply receives the millions of Form 1099 filed with it and stores them. It has established no arrangement or system to match the filed Forms 1099 with the corresponding tax returns. Without disclosing details mentioned in the sealed record, it appears that some Form 1099 information is picked up and checked against taxpayer returns, and if the item is not reported on the schedules, an investigation may ensue.

When Form 1099 information is at hand, IRS knows the name of the taxpayer, the amount of the interest or dividend reported, and the name of the payor. Given this information, IRS is entitled to issue summons to the payor, a third-party recordkeeper, for its own books and records in respect to taxpayer, without having any need for the retained copy of Form 1099.

1. Strictly speaking the aspects do not diverge at this point. At least so far as 26 U.S.C.

Section 7122(a) is concerned, both aspects are transferred from Treasury to Justice.

Like any other information report, a Form 1099 may contain one or more errors. The test in determining a taxpayer's liability is not what the Form 1099 shows, but what the payor's records show, particularly entries of accrued interest, or cancelled checks for interest or dividends. These are primary records. The Form 1099 is not. Since IRS already knows what the Form 1099 information is, investigation and verification are not advanced by inspection of the payor's retained copy, but will be by inspection of primary records, which may or may not be the same as the Form 1099 information.

Conceivably, IRS may want the payor's retained copy as proof that the taxpayer received his copy, a factor which could go to the issue of knowing failure to report the item. If so, the basis is irrational since tangible evidence of the retained copy is not proof that taxpayer received it. No bank or dividend-paying corporation of any size is likely to be able to produce any witness able to testify that taxpayer X's Form 1099 was mailed to him. The most that can be expected is that some witness will be able to testify about the business system used to prepare these forms and to mail them out, and no more. No such witness could be expected to testify that X's form was mailed to him. As with any large mailing X's form may have wound up in Y's envelope. Thus, the only evidence of any value would be evidence of the system, a subject that can be inquired into outside of 26 U.S.C. § 7609 since it does not involve the production of records duces tecum. And, since IRS possesses the Form 1099, and could only have it if it was sent to it by the payor, it already has all the proof it needs on that score.

The fact that IRS possesses Form 1099 information, either on paper forms or on magnetic tape, is enough to preclude summons enforcement to the payor for retained copies. If IRS has not arranged to look up the filed information it has, no doubt because of cost considerations, it can

hardly put that burden on payors. To do so would impose on payors the very burden of cost and expense avoided by IRS in failing to provide itself with means for access to its own records. The cost of arranging all Forms 1099 alphabetically by taxpayer name, or numerically by ID Number, is just as great for all payors as it would be for IRS.[2] If IRS is free to store Forms 1099 in warehouses without means of access, there is no reason why a payor cannot do the same, and when served with an IRS summons merely say: "We have all our retained copies of Form 1099 but they are merely stored, any which way, and we can't locate any particular one without going through all of them".

To suggest that the payors must make an outlay to organize all their retained copies for easy location and retrieval, when only a small number will ever be called for, would impose on them the kind of expense to perform a governmental function that would make Vivian Kellems chortle, "I told you so,". For those who do not recall her, see *Kellems v. U. S.,* 97 F.Supp. 681 (D–Conn., 1951) and *Kellems v. California C. I. O. C.,* 68 F.Supp. 277 (D–Cal., 1946). See, also, *Neal v. U. S.,* 402 F.Supp. 678 (D–N.J., 1975).

The decision in *U. S. v. Theodore,* 479 F.2d 749 (CA–4, 1973) relied on by the United States is not to the contrary. In that case, the summons was directed to a tax preparer, himself the target of an investigation as the result of field tests indicating that returns were not properly prepared. The summons was for retained copies of all returns prepared for the years 1969–1971. Necessarily, IRS had the original returns if they were filed at all, and the summons was resisted on that ground. IRS replied that there was no way to locate those returns made out by the preparer without examining all filed returns to find out who prepared them. Despite this argument, the District Court enforcement order was reversed as too broad and too vague, and enforcement was limited to providing a list

---

**2.** This cost, as well as the cost of retrieval, is in addition to the cost of creating the information

returns in the first place and the cost of mailing.

of the names, social security numbers and addresses of taxpayers for whom returns had been prepared. With such a list, rather than the retained copies, it was indicated that IRS could locate and examine its own filed returns.

■ Rather than support the United States, the rationale of that ruling supports the objection. If any general principle is to be inferred from the ruling, it is that IRS may not use the court's process to place on another a burden it can, or should be able to, carry itself. See, also, *U. S. v. Bank of Monte Vista*, 451 F.Supp. 945 (D–Colo., 1978), memorandum opinion by Chief Judge Winner.

■ On the issue of enforcement of the summonses as such, the court has concluded after extensive deliberation that the record before it leaves it no choice but to order enforcement, except for the retained copies of Form 1099.

This conclusion stems from what the court regards as the law binding on it, so far as laid down by the Supreme Court and the Court of Appeals. Were it not for this, the court's inclination would have been to allow discovery so that taxpayer could have an opportunity to meet the very heavy burden of showing "institutional bad faith" under *LaSalle*. However, the court considers that this burden could not be met on the record and theories involved in this case under existing decisions.

Institutional bad faith is an undefined term. In this case, it had seemed that a partial definition might have been developed on the theory that IRS refusal to negotiate, looking to a possible compromise if one can be reached, despite taxpayer's request, might reflect a de facto position, institutionally taken, in conflict with what the statutes and regulations say.

It is true that the *LaSalle* court, in selecting the event of referral as the point beyond which an IRS summons may not issue, relied heavily on the complete division of compromise authority specified by 26 U.S.C.

§ 7122. It is also true that that ruling assumed the existence of interagency cooperation, both before and after referral, so that the Congressional purpose to have compromises of both the civil and criminal aspects of a tax case could be achieved. That assumed cooperation, it said, is "to be expected and probably encourages efficient settlement of the dispute." See 98 S.Ct. at 2365, column 2.

The record here shows clearly that in fact and practice there is no cooperation of the kind probably understood by the *LaSalle* court. Evidently, before referral, there is no participation by the U.S. Attorney's office except for the limited purpose of carrying out a referral to file complaint for an enforcement order (since IRS and its staff counsel cannot appear in court except through the U.S. Attorney). On those limited referrals, the assistant given the matter is one from the civil division who is not trained or equipped to handle the criminal aspect if there be one. The "case" itself, of course, still remains with IRS for all purposes except the securing of an enforcement order. Thus, there is no means for "interagency cooperation" at that point, in the sense that IRS can negotiate a settlement of both civil and criminal aspects, with informal participation by the U.S. Attorney to assist in the negotiation of an agreement under Rule 11, F.R.Crim.P., which IRS by itself is probably unequipped to handle.

The court also takes judicial notice, from frequent observation of such cases over the years, that even after referral for criminal charges, and even when the criminal charges are resolved through a Rule 11 agreement, there is no interagency cooperation at all except for the criminal aspects, and never for the purpose of achieving "efficient settlement of the dispute" by compromise of both civil and criminal aspects.[3]

After referral, to the extent that the U.S. Attorney needs technical aid and support to analyze material obtained by the Grand

---

**3.** In a criminal tax case, the assistant is one from the Criminal Division and is untrained in the civil aspects of tax law. These are handled from Washington.

Jury, the court is traditionally presented with an order to allow IRS personnel to have access so that they may aid the U.S. Attorney in performing his function, even though IRS "completed" its investigation for both civil and criminal purposes before referral. That, of course, was the required practice in this Circuit before the 1977 amendment to Rule 6(e), F.R.Crim.P., as exemplified by *In re Grand Jury Proceedings,* 309 F.2d 440 (CA–3, 1963), and *Robert Hawthorne v. Director, etc.,* 406 F.Supp. 1098 (D–Pa., 1976) (including the reference to *Shamy v. Goldstein,* at pp. 1122–1123); *In re Grand Jury Proceedings (Pflaumer),* 53 F.R.D. 464 (D–Pa., 1971). And see also, Note of Advisory Committee on Rules, 1977 Amendment, and Notes of Committee on the Judiciary, Senate Report No. 95–354, as published in the 1979 West Pocket Part for Title 18 U.S.C.A., Rule 6, at pp. 26–27. Under the 1977 Amendment to Rule 6(e) disclosure of Grand Jury materials may be made without court order to government personnel (such as from IRS) as are needed to assist the U.S. Attorney; and disclosures thereof are made to the court under Rule 6(e)(2)(B).

By that last provision, the government personnel (e. g., IRS) may not use the Grand Jury material for any purpose other than to help the U.S. Attorney in performing his duty to enforce Federal *criminal* law. Thus, in a referred tax case, the rule seems on its face to bar IRS from providing the kind of interagency cooperation needed for the U.S. Attorney to negotiate and compromise not only a Rule 11 agreement for the criminal charge but also a disposition of the *civil* aspect, by compromise, as contemplated by 26 U.S.C. § 7122(a) and the *La-Salle* court.

Not only that, but the absence of IRS cooperation on a referred case disposed of by plea under a Rule 11 agreement shackles the court at sentence time because the door to resolving the civil tax liability along with the plea, or after plea and before sentence, is shut tight. Unlike other criminal cases

with civil aspects, such as embezzlement, bank misapplication, mail or wire fraud, false statements on F.H.A. applications, interstate theft, and countless others, the defendant in a tax case is precluded from resolving the civil claim so that it may be taken into account at sentence, where it can be an important consideration.

Also, the court knows that after the criminal tax case is closed, the case is re-referred back to IRS to take up the civil tax liability (which can include a fraud penalty). This is evident from the flow of *ex parte* orders to allow the U.S. Attorney to turn over the Grand Jury material to IRS so that it may take up the civil aspects.[4]

It has also been stated on the record in this and other cases that while the Secretary of the Treasury has entered delegation orders for compromises down to the District Director level, see Standard Federal Tax Reporter (CCH, 1979), at ¶ 5967.0257, *et seq.,* the Attorney General evidently has not, even after a referral under 26 U.S.C. § 7122(a). Thus, on a referred case, the U.S. Attorney may act only in respect to the criminal side of the tax case, including the negotiation of Rule 11 agreements, but claims to have no authority to negotiate and compromise the civil aspects of the same case. Evidently, IRS must consider itself without authority to provide the interagency cooperation envisioned by the *La-Salle* court in order to achieve efficient settlement of the dispute, probably on the theory that the event of referral transfers exclusive authority to the Attorney General.

In tax fraud cases, which are the kind the *LaSalle* court viewed as the ones where the element of fraud carried civil penalties as well as the risk of criminal prosecution, the regulations to implement § 7122 expressly bar compromise of criminal liability. See Reg. § 301.7122–1(b), second sentence, in Standard Federal Tax Reporter (CCH, 1979), at ¶ 5695.

Hence, while there is no doubt that taxpayer here has all access to negotiations

---

4. Under Rule 6(e), F.R.Crim.P. as amended in 1977, it may be that there is no authority for

these orders allowing Grand Jury material to go to IRS after re-referral.

blocked institutionally, the court is by no means confident that the blocking, even though it obviously frustrates Congressional purpose and the understanding of the *LaSalle* court, constitutes "institutional bad faith".

Conference practice is spelled out generally in the regulations, 26 C.F.R. § 601.501, and in the case of matters in the Intelligence Division, by 26 C.F.R. § 601.107, the latter of which appears to apply here. While paragraph (b)(2) says that a taxpayer "who may be the subject of a criminal investigation will be afforded a district intelligence conference when he requests one", the scope of the conference as there detailed is limited and does not by its terms extend to negotiations looking to a possible compromise of civil tax liabilities. Presumably this is because the personnel of the division, unlike the revenue agents of the audit division, are not equipped (and perhaps not authorized) to deal with civil tax aspects except for items like the 50% ad valorem tax under 26 U.S.C. § 6653(h) and § 6659(a), as noted by the *LaSalle* court.

In practice, as the court understands it from the record here, once a tax case is assigned to the Intelligence Division, that agent is in charge of the matter, and although a revenue agent is assigned to work with him he is subordinate. If audit aspects are pending, they are asked to be suspended entirely while the Intelligence investigation goes on. The effect is that the civil aspects are not "abandoned", in the sense that the administrative summons can be said to be intended for an "investigation [which] has solely criminal purposes", 98 S.Ct. at 2367.

Taxpayers' frustration, and the frustration of the Congressional purpose, then, seems to be the result of institutional *structure* within and between IRS and the Department of Justice, brought about by the interplay between statutes, regulations, delegation orders or their absence, rather than of institutional *bad faith.*

No doubt this institutional structure, by closing all avenues to any kind of negotiation during the time that the civil tax aspects are "on the shelf" but not "abandoned" is a hindrance not only to interagency cooperation but to intraagency cooperation as well, and prevents any achievement of efficient settlement of the dispute by any means once the Intelligence Division is in the picture until (a) there is a decision not to refer for prosecution or (b) there is a re-referral to IRS after referred cases are closed by judgment of dismissal, acquittal or sentence. Until then, the case is in limbo, "on the shelf", in a state of suspended animation.

Whether this is what the upper courts mean when they speak of an "abandonment" of civil aspects is far from clear, especially when all indications are that IRS does not ever "abandon" civil aspects if anything in the case is active. Even if a taxpayer dies, thus precluding criminal prosecution, civil aspects can continue to be pursued against his estate. Absent clearer guidance, this court does not feel authorized to regard the suspension of the civil aspect as amounting to even a temporary "abandonment" (an inherent contradiction in terms). It is only if upper courts conclude that during the time the civil aspects are shelved the investigation has solely criminal purposes can enforcement be denied on that theory at the trial level. Absent such an articulation, it is doubted that any taxpayer will ever be able to show institutional bad faith, much less carry his very heavy burden.

The net practical effect may be that the forecast of the minority in *LaSalle* (which would not have allowed any inquiry so long as the summons is issued before referral) will become reality, and the Congressional purposes of requiring notice, authorizing automatic stay and mandating intervention, 26 U.S.C. § 7609, may be rendered "unworkable".

Certainly, it puts in doubt the perceptive analysis of Judge Gibbons in *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85, at 89–92 (CA–3, 1973). That ruling equated the administrative summons or subpoena with the Grand Jury subpoena in enforcement cases and comprehensively, if not de-

finitively, reviewed the many constitutional and non-constitutional areas open to exploration and determination before a court will be satisfied that its process will not be abused or misused by entry of the order.

Nor does the court consider that it has authority, in view of the closed doors of the institutional structures of IRS and Department of Justice, to condition the grant of a compliance order on good faith negotiations by taxpayer and IRS for a reasonable period, to explore the likelihood of arriving at a compromise of the civil and criminal aspects. Such a condition, were it authorized, would go far toward achieving efficient administration of the tax laws first because it would encourage negotiations evidently not conducted at all now, and because taxpayer's good faith might depend on his willingness to withdraw his objections to the summons. Full disclosure would clearly be essential to a valid compromise.

■ Finally, a word must be said in respect to procedure. This District has not adopted a local rule adopting procedures like those suggested in *U. S. v. McCarthy,* 514 F.2d 368 (CA–3, 1975). This being so, the procedure using a petition and order to show cause to the witness (bank or corporation, etc.) is not proper. Enforcement suits, absent a local rule, should follow the usual practice of a summons and complaint, followed by answer, application and order for intervention, and so on. In this class of cases, the summoned witness is in fact a stakeholder with no interest. It is not the real party in interest; the taxpayer is. Hence, the summoned witness preferably should file answer with a counterclaim for interpleader, or in the nature of interpleader, so that it can be allowed its costs and expenses of compliance and step out of the case, leaving the United States and the taxpayer to litigate the only real dispute there is.[5]

Since that procedure was not followed here, all of the summoned witnesses will be regarded as having filed such pleadings, and to be entitled to their costs and expenses of compliance, and the order to be submitted should so provide.

■ This ruling will be applicable to the companion case, Civ. 78–3056 (Consolidated) and a like order is to be submitted for it.[6]

### MEMORANDUM ORDER

At the hearing of April 19, 1979 presentation was made on a number of items for settlement of the form of Order to be entered to effectuate the Opinion dated April 17, 1979. These are decided here.

1. *Access to sealed transcript and documents.*

The United States submitted a group of internal memos of IRS, which were examined in camera. A conference was held to obtain explanations, and the transcript was sealed. Taxpayers ask access to both, for the purposes of appeal. The United States objects.

The documents (and the transcript) come within the class of "official information," privileged under Proposed Fed. Ev. Rule

---

**5.** Another procedure was discussed at the hearing of April 19, 1979. This would use a motion and an order granting leave to proceed in a summary manner, with procedures modelled on the highly successful experience with N.J. Court Rule. R.4:67.

**6.** The decision and the enforcement order are not intended to affect whatever right taxpayer may have to challenge the use, in another case, controversy, action or proceeding of any kind, of any of the documents, testimony or information (or any information directly or indirectly derived therefrom) obtained through the enforcement order. One example is a motion to suppress such use at trial on a later criminal

charge if there be one. See *U. S. v. Genser, supra.*

It is also observed that, should there be a judgment of conviction in a criminal tax case, such a judgment may not be any evidence of the amount of tax in a later civil suit, even though the indictment recites a specific amount and there be a verdict of guilty or a guilty plea. This is because, even on a charge of willfully and knowingly filing a false tax return, the specific amount charged in the indictment probably is not a "fact essential to the judgment." See Fed. Ev. Rule 803(22). There may be a number of items making up the specific amount, and a general verdict or plea of guilty will be valid if any one be false.

509(a)(2). That Rule was not adopted, but insofar as it reflects the principles of the common law, as interpreted by the Federal Courts in the light of reason and experience, it is embodied in Fed. Ev. Rule 501.

This case does not involve military secrets such that the claim of privilege must be decided without requiring disclosure, even in camera, *U. S. v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). Rather, it is a case in which the Government's claim of need for secrecy is to be balanced with the party's need for disclosure, albeit under a protective order. See, for example, *Boeing, etc. v. Coggeshall,* 108 U.S.App.D.C. 106, 280 F.2d 654 (1960); *Ackerly v. Ley,* 137 U.S.App.D.C. 133, 420 F.2d 1336 (1969); *Davis v. Braswell,* 363 F.2d 600 (CA–5, 1966); *Kaiser, etc. v. U. S.,* 157 F.Supp. 939, 141 Ct.Cl. 38 (1958). The indications are that the test is whether disclosure in the action would be harmful to the interests of the public. Compare N.J. Ev. Rule 34, N.J.S.A. 2A:84A–27. See, also, *In re John S. Irving,* 600 F.2d 1027 (CA–2, 1979).

On balance, while the Court has already ruled that taxpayers' effort to show institutional bad faith through these sealed materials would be fruitless, they are entitled to try to persuade the Court of Appeals to rule otherwise. They cannot make the argument in any effective way without access to the materials. Disclosure to taxpayers' attorneys only, with a protective provision limiting use of the materials to the purposes of the appeal, requiring any papers on the point to be submitted to that Court under seal, and forbidding disclosure to any other person (including taxpayers) will not be harmful to the interests of the public.

The Order should contain a provision to this end, and also providing that the release under protection be stayed until an Order of a panel of the Court of Appeals be entered to adopt a like protective and sealing Order to govern the proceedings there, or modifying or vacating the provision or the stay or both.

2. *Reconsideration of the denial of a stay pending appeal.*

At its ruling from the bench, the Court denied a stay of the enforcement Order pending appeal. There were several reasons. One was that in the event the enforcement Order be reversed, taxpayers' interests would be adequately protected by a provision requiring IRS to make a detailed, itemized list, and to mark, all documents produced in response to the subpoena to each witness, and a transcript of any evidence adduced other than the exhibits. This was discussed in more detail at the hearing of April 19, 1979. Second, since the time needed for an appeal to be decided is unpredictable, especially in view of the exceptionally heavy workload of the Court of Appeals, the IRS investigation would be unduly hampered in the event of affirmance. The documents sought on the present subpoenas may well be only a first level of the investigation. The information obtained may call for more subpoenas to other witnesses before the investigation is completed.

It is true that *In re Turner,* 309 F.2d 69 (CA–2, 1969) mentions the running of the Statute of Limitations as a factor militating against a stay. It is also true that, as amended in 1976, 26 U.S.C. § 7609(e) suspends the Statute of Limitations as to a taxpayer/intervenor for the time consumed by the enforcement proceeding and appeals therefrom. But the suspension of the Statute of Limitations does not protect against the loss of records or the dimming of memories. Nor does it protect against the running of the Statute of Limitations in respect to persons other than the intervenor, about whose tax liability questions may arise as the result of information gathered.

There may be cases where the issues raised by the answer, or by a counterclaim, in the enforcement action extend beyond the narrow scope of an enforcement suit, in which a stay might well be proper. In this case, no questions are seen beyond the issue of propriety of enforcement according to the standards of *LaSalle.*

Having reconsidered, the Court adheres to its initial ruling that a stay pending appeal be denied. This is without prejudice to taxpayers' right to seek a stay from the Court of Appeals. The date for production of the documents can be set for one some weeks after entry of the Order so that the application can be made meanwhile.

### 3. *Further consolidation.*

Both sides agree that Civ. 78–3056, involving other taxpayers, should be consolidated with Civ. 78–3054, for all purposes. The issues and record are identical except for the taxpayers and the witnesses. The consolidation will provide means for taking a single appeal on all the questions involved. A separate Order to that end will be entered.

### 4. *Exhibits.*

There are two folders of IRS memoranda that the Court examined in camera. These will be marked Exhibits C–1 and C–2, under seal.

There is a letter of March 13, 1979 from taxpayers' attorney to the Court in chambers, supplying copies of the Reopening Letters issued to taxpayer. This set will be marked Exhibit C–3.

There is a letter of March 20, 1979 from taxpayers' attorney to the Court in chambers along with papers involving their FOIA request in connection with this matter. This set will be marked Exhibit C–4.

There is a letter of March 29, 1979 from the AUSA dealing with procedures. This letter and attachment will be marked Exhibit C–5.

### 5. *Other.*

The ruling granting the enforcement Order is not intended to affect adversely taxpayers' rights in other contexts to challenge the right of the United States to make one or another use of the information so obtained. One example, is a motion to suppress evidence at trial of a criminal charge if one be brought, *U. S. v. Genser,* 582 F.2d 292 (CA–3, 1978), and after remand, 595 F.2d

146 (CA–3, 1979) (Nos. 76–2623/4, decided March 9, 1979). This is so without regard to whether the theory be res judicata, collateral estoppel or any other. The order should contain a provision expressing this point.

SO ORDERED.