**Emanuel S. GAMBINO, Petitioner,**

v.

**James J. POMEROY, Acting District Director, Immigration and Naturalization Service, Respondent.**

Civ. No. 82–303.

United States District Court,
D. New Jersey.

Dec. 2, 1982.

On Dismissal of Petition for
Naturalization April 29, 1983.

Vincent J. Agresti, Newark, N.J., for petitioner; Filindo B. Masino, Philadelphia, Pa., of counsel.

Edward Weiss and Leo Weber, Newark, N.J., for respondent.

## MEMORANDUM

BIUNNO, Senior District Judge.

This is a proceeding by a resident alien seeking to be admitted to citizenship by naturalization. Because the procedural history is somewhat unusual, its highlights are noted here.

The earliest document seems to be an "Application to File Petition for Naturalization", dated March 15, 1976, attached to which is a "Statement of Facts for Preparation of Petition, Section of Law 329" signed by the preparer and the applicant on April 9, 1976 in Dover, Delaware, and sworn to before a Naturalization Examiner in Philadelphia on May 26, 1977. There are two witnesses, Sharon Raciti and Robert Skalsky, with addresses.

This Application and Statement (Exh. 2, Tr. 3/29/82, p. 66) is 4 pages and shows various written corrections numbered 1 to 38. The affidavit on the last page verifies the truth of the statements in the form as corrected, and the jurat/certification says that before verification, the applicant heard the application and corrections and understood their contents.

The supplemental form referred to evidently is the first 2 pages of Exh. 3, Tr. 3/29/82 p. 66, only the first page of which was filled out and sent by the Immigration and Naturalization Service to the military for certification of military service. The second page, or back of the sheet, is the certification as filled out and dated November 1, 1977, and the next two pages are a record of Special Court-Martial Order No. 539 of March 11, 1970. The last page shows receipt by INS in Philadelphia on November 15, 1977.

The Petition for Naturalization itself, only the first page of which is Exh. 1, Tr. 3/29/82 p. 65, was evidently referred to INS in Philadelphia where a "Designated Examiner" administered the oath to the petitioner and both witnesses on May 26, 1977, and the Clerk of the Court in Wilmington endorsed it as filed there on June 1, 1977.

In his application, petitioner had added (correction 3) the statement that: "My lease runs out at the end of May, 1977. I will move to N.J. at the end of this month." The jurat/certification shows that this statement was also made on May 26, 1977.

In any event, on July 11, 1977 petitioner signed an "Application for Transfer of Petition for Naturalization" asking the court in Wilmington to transfer his petition to the court in Newark, N.J. This form indicated that petitioner then lived at 3 Conrow Road, Delran, N.J. It was sworn and subscribed in Camden.

On August 18, 1977, an order of transfer was signed in Wilmington by Chief Judge Latchum, and on August 30, 1977 an order approving the transfer was signed by Judge Stern in this court.

This part of the history clears up the questions raised when the matter first came before the court, Tr. 2/22/82, page 2, line 23 to page 11, line 1.

The next event of record is that on February 2, 1982, petitioner filed another "petition" in this court, which was given Civil No. 82–303, and a 60 day summons issued.* On the same date, a notice of motion was filed returnable February 22, 1982 for an order to INS to conduct a preliminary hearing.

At that hearing it appeared that the investigation which the statute assigns to INS to make as a basis for a report was not yet completed, but was awaiting a federal Grand Jury investigation for income tax evasion. This implied a "referral" from the Treasury Department to the Department of Justice, see *U.S. v. La Salle Nat'l Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), and the observation about the actual process noted in *U.S. v. Garden State Nat'l Bank,* 465 F.Supp. 437 (D.N.J., 1979), and later on in *U.S. v. First Nat. State Bank of N.J.,* 469 F.Supp. 612 (D.N.J., 1979). See Tr. p. 11, line 4 to p. 12 line 7.

The question then was raised by the court whether pendency of such an investigation would present Fifth Amendment problems if there were claims of possible self-incrimination raised in the course of the INS investigation. Petitioner's lawyer said: "We don't claim any privilege at all, your Honor." (Tr. p. 14, lines 9–10).

After a colloquy dealing with tax returns requested but not supplied, the court directed that an order be submitted for petitioner to supply INS with copies of such federal and state tax returns and estimates as he had filed from February, 1973 to the date of the order, "inclusive of all supporting documents such as forms 941 and W–2". The court noted petitioner's right to obtain copies of filed returns from the taxing authorities. This was to be done on or before March 15, 1982 and the hearing on the motion was carried to March 29, 1982.

At the hearing, the court noted its readiness to entertain an application to require tax authorities said to have petitioner's books and records, to supply him with copies (Tr. p. 23, line 24 to p. 25, line 15). No application for this purpose was ever made.

At the continued hearing of March 29, 1982, there was received as Exh. 5, Tr. p. 166, a 9-page transcript of a continued preliminary examination before a designated naturalization examiner, and a number of exhibits to be mentioned.

Petitioner was told that his statements should be voluntary, in that they may be used against him in any criminal or civil proceedings; he said he understood and was willing to make a statement under those conditions. He was also told that his statements would be made under oath, and that if any were knowingly a false statement, this could make him subject to a fine, imprisonment or both [presumably this referred to 18 U.S.C. § 1015(a) ]; he said he understood and was willing to make a statement under oath.

---

* The summons, with copies of the petition, is still in the hands of the U.S. Marshal, unserved. That office reports that on February 16, 1982, it sent a form letter to petitioner's attorney of record requesting a Form 85 be sent with instructions for service and return. It was never received. See, also, F.R.Civ.P. 81(a)(2).

He seems not to have had explained to him that under 8 U.S.C. § 1101(f)(6), the giving of false testimony for the purpose of obtaining any benefits under the naturalization statutes is an act which Congress has declared to preclude a determination that an applicant is a person of good moral character. See *Berenyi v. District Director, etc.,* 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967), where the district court denied an application for citizenship expressly because it found that petitioner had testified falsely in the preliminary proceedings, and therefore was "not a person of good moral character within the meaning of the Immigration and Nationality Act" (385 U.S. at pp. 634–635, 87 S.Ct. at p. 669).

In any event, he answered questions about himself and his current status and occupation, about the papers he had signed for naturalization, including the certification of military service, and the tax materials called for by the order of March 5, 1982. Briefly, these were copies of tax returns for the years 1973 through 1977 inclusive and will be mentioned later.

He was asked about tax returns for years after 1977, which he said was the last year for which he filed a tax return. He testified that he guessed the crime commission or somebody, "I don't know who it was" took all the records, "the IRS they took all the records and we have been trying to get them back" but had no luck, so he was trying to file returns but without the records it becomes harder and harder. He was referring to business and personal records, his cancelled checks "and all that stuff like that" that would help to do the income tax. He said he was sending the money toward those taxes because he didn't know what he owed, and didn't want them to think he didn't want to pay his taxes.

At the hearing of March 29, 1982, there was also presented an affidavit of a New Jersey attorney who said he had been retained to represent petitioner with regard to filing "certain income tax returns" on his behalf, and in turn had retained an accounting firm, working particularly with two of its members, "to completely, legally and adequately" prepare all tax returns on petitioner's behalf. He also said that another accountant had been retained by petitioner and was in possession of all books, records and documents needed to properly prepare tax returns when all of them were seized [probably means subpoenaed] for a Grand Jury investigation, including documents relating to taxpayers other than petitioner. As a result, the lack of documentation resulted in delay and thus full preparation became extremely difficult. He said that every effort was being made to fully comply with U.S. laws on tax returns (no mention is made of State tax returns). Along with this affidavit there were copies of returns as enumerated in the memorandum of November 5, 1982.

The court examined this group of returns (years 1973–1977) on the bench at the hearing of March 29, 1982 and commented that some of the material seemed open to question at first review, that the supporting documentation was not included, and questioned why no final returns, estimates, and the like had been filed (both State and federal) since the 1978 filing of the 1977 return.

The explanation given in the attorney's affidavit—that the books and records had been taken—was questioned. Petitioner (though not under oath) said that the first records taken were for 1976, and that they have been taken for every year since (Tr. p. 33, lines 9–17). Asked how he could run a business and draw a salary, pay expenses and the like without books and records, he explained that at the end of each month the cancelled checks, checkbook stubs, and so on, are all turned over to the accountant who then prepares and sends petitioner a monthly report. He had these at the office and did not have them with him. He had them for 1981 but not earlier, as IRS took all copies: the accountant's and his. He could not make estimates from the current monthly reports because of the circumstances, such as:

"I might have had a loss in certain years" (Tr. p. 27, line 18).

"Because I have some apartments that I own" (Tr. p. 27, line 19).

"I have income from different sources and I need the records in order to tell me how much each source gave me" (Tr. p. 33, line 19).

"I have other income. I have income from stocks, I have income from the sale of a store * * *" (Tr. p. 34, line 12).

He sends "them" money every two or three weeks towards his taxes because he knows he owes them money but doesn't know how much. He sends a check in a letter that he is paying for a particular year; he just sends money but no estimated return. Tr. p. 34, line 23 to p. 36, line 3. No copies of letters or checks, or any list of these alleged payments has been submitted, and the returns later filed show no entry of any credit for their payment.

After a colloquy, the court commented that petitioner did not seem to have obeyed the order of March 5, 1982 because there was no indication that he had made any request of federal or State authorities for copies of filed returns. There was no New Jersey return for 1977 although he lived here then and the current gross income tax took effect in 1976. The attorney whose affidavit was submitted had only recently been engaged (Tr. p. 31, lines 13 to 21; p. 45, lines 22 to 24). The records were taken from Book and Bamberger in Dover, Delaware and from Don Baldwin in New Jersey (Tr. p. 33, lines 3 to 6), but neither is listed in the lawyer's affidavit as an accountant engaged to help prepare returns.

The court indicated that under the basket provision of 8 U.S.C. § 1101(f), the question it needed to consider was whether an individual who does not file returns, does not file estimates, for the length of time petitioner had indicated he had not filed, matches the statutory standard of a person of good moral character. Tr. p. 48, line 24 to p. 49, line 3.

After some comments about the 1977 federal return (filed in 1978) and the absence of a New Jersey return, and the later failure to produce final returns through 1980 and estimates for 1981, Tr. p. 60, line 1 to p. 62, line 20, the court tendered petitioner an opportunity to decide whether to withdraw the petition without prejudice, or to have an extension of further time to produce records and to supplement the record.

After private consultation, petitioner decided to ask for more time, and the court directed that the motion be marked "date to be set", with a status report around the end of June, 1982. Tr. p. 64, line 20 to p. 65, line 16.

On June 23, 1982, the court sent a memorandum order to submit a detailed status report no later than June 30, 1982. This evidently crossed in the mail a letter from petitioner's Pennsylvania counsel sending an accountant's certificate and copies of federal and New Jersey final returns (but no estimates) for calendar 1978, 1979, 1980 and 1981.

Another letter from counsel dated July 2, 1982 reported that the material sent constituted everything that would be submitted.

By letter of October 28, 1982, petitioner's counsel sent the court a brief, and about the same time the court set November 30, 1982 as the continued date for the pending motion. By memorandum dated November 5, 1982, the court listed the various exhibits presented for the March 29, 1982 hearing date as well as those sent in late June, and called attention to other items requested but not included. Finally, with a letter dated November 18, 1982, petitioner's counsel sent a supplemental brief to the court.

*Discussion of the Law.*

The basic requirements specified by the Congress for naturalization are spelled out in 8 U.S.C. § 1427 (section 316 of the 1952 Act). Subsection (a) basically requires at least 5 years continuous residence in the United States after lawful admission for permanent residence, at least 50% of the time during the 5 years immediately before filing to be physically present here, and at least 6 months' residence in the State where the petition is filed.

It also requires continuous residence in the U.S. from the date of the petition to the time of admission to citizenship (sub par. 2), and, during all of the periods referred to (i.e., before filing and after filing) it re-

quires that the person "has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States" (sub par. 3).

Subsection (b) deals with absences from the U.S. for more than 6 months but less than 1 year, and is not of interest in this case.

Subsection (c) qualifies the provisions of subsection (b) and is not of interest here.

Subsection (d) declares that no finding by the Attorney General that a petitioner is not deportable shall be accepted as conclusive evidence of good moral character.

Subsection (e) provides that in determining whether the petitioner has sustained the burden of establishing good moral character and the other qualifications specified in subsection (a), the court is not limited to petitioner's conduct during the 5 years before filing but may take into consideration conduct and acts at any time before that period.

Subsection (f) deals with the effect of proceedings under the Subversive Activities Control Act of 1950 and has no application to this case.

Definitions established by Congress for use in connection with the 1952 Act are set out in 8 U.S.C. § 1101. The definitions applicable here are those set out in subsection (f). That provision, like the provisions in § 1427(a), is cast in negative terms:

"No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—"

and there then follow specific categories, (1) through (8), followed by what the court has mentioned above as the "basket clause":

"The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."

The entire text of subsection (f), although included with various definitions, is in fact not a "definition" in the usual sense, but is a set of congressionally selected circumstances which, if they exist, bar a finding of good moral character. Aside from the 8 specific categories for which "good moral character" is barred, the term carries its usual meaning as made clear by the basket clause.

Reference is also needed to § 329 of the 1952 Act, 8 U.S.C. § 1440, because that is the section under which the petition was filed. That section contains special rules for petitioners who had active-duty service during specified periods related to World War I, World War II, or the Korean, Vietnam or other periods of military hostilities.

Subsection (a) sets out the requirements for naturalization under § 1440. It is divided into several parts. The first part sets two requirements for a person serving during one of the designated periods: (1) he must have served honorably in an active-duty status during one of the indicated periods, and (2), if separated from service, was separated "under honorable conditions".

A person meeting these two requirements "may be naturalized as provided in this section if":

(1) he was in the United States (or other specified place) when he enlisted or was inducted, OR

(2) was lawfully admitted to the U.S. for permanent residence any time after enlistment or induction.

The section next provides that the executive department under which petitioner served is to determine whether (1) he served honorably in an active-duty status, AND (2) separation from service was under honorable conditions.

There follow certain provisos or exceptions not of interest here.

Subsection (b) requires a petitioner coming within (a) to comply in all other respects with the requirements of Title III of the 1952 Act, with stated exception that

(1) he may be naturalized regardless of age, and notwithstanding certain statutory provisions;

(2) no period of residence or specified period of physical presence within the U.S. or any State is required;

(3) the petition may be filed in any court having jurisdiction to naturalize, regardless of petitioner's residence;

(4) military service shall be proved by a duly authenticated certification which shall state whether (1) petitioner served honorably in an active-duty status during a specified period of war or other hostility, AND (2) was separated from such service under honorable conditions;

(5) the petitioner may be naturalized immediately, if he and his witnesses appeared before and were examined by a representative of the Service before filing the petition, regardless of the usual procedures under 8 U.S.C. § 1447(c).

Subsection (c) deals with revocation in cases where naturalization occurred during active-duty status and there is later a separation under other than honorable conditions. It has no application here.

Subsection (d) deals with petitions filed before January 1, 1947 and has no application to this case.

There appears to be no doubt that the petitioner carries the burden of persuasion to establish compliance with and satisfaction of all the requirements and conditions specified by Congress. No greater degree of proof being indicated, the level is that of a preponderance. If the evidence about an element or other be in equipose or less, the burden of persuasion has not been met, and the petition cannot be granted.

There are differences in the rule when the Government seeks to strip a person of citizenship already acquired, or deport a resident alien; in such cases it carries the heavy burden of proving its case by clear, unequivocal, and convincing evidence.

"But when an alien seeks to obtain the privileges and benefits of citizenship, the shoe is on the other foot. He is the moving party, affirmatively asking the Government to endow him with all the advantages of citizenship. Because that status, once granted, cannot lightly be taken away, the Government has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship. For these reasons, it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect. This Court has often stated that doubts 'should be resolved in favor of the United States and against the claimant.' E.g., *United States v. Macintosh,* 283 U.S. 605, 626, 51 S.Ct. 570, 575–576, 75 L.Ed. 1302, 1311." *Berenyi v. District Director,* 385 U.S. at 636–637, 87 S.Ct. at 670–671.

Similar distinctions are made in cases where revocation is grounded on a showing that citizenship was "illegally procured", especially where disqualifying conduct took place before entry into the United States and the pertinent facts were concealed. The most recent example in this area seems to be *Fedorenko v. U.S.,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), and the discussion at pages 505–512, 101 S.Ct. at pages 746–750.

*Analysis of the factual record.*

At the hearing on March 29, 1982, the record available to the court was that compiled to that point by INS, with some, but not all, tax data called for having been presented for the period 1973–1977. Further tax returns were sent to the court around the end of June, covering the years 1978–1981 but even these are incomplete.

On the present factual record, the court harbors a number of doubts of some significance, which are discussed here.

The first item of concern is whether the duly authenticated certification dated November 1, 1977 in response to the INS "Request for Certification of Military or Naval Service" meets the requirements of § 329 of the 1952 Act, 8 U.S.C. § 1440. As noted above in the analysis of that section the departmental certification must show a determination of two aspects, both of which must be satisfied: (1) honorable service in an active-duty status, AND (2) separation under honorable conditions. The certification in this case shows separation under honorable conditions but does not affirma-

tively certify honorable service in an active-duty status. Instead, under "Remarks", which are to include any derogatory information, there is the entry "See attached document", which is the Special Court-Martial Order No. 539 of March 11, 1970.

It shows that petitioner was charged with violation of Art. 86 of the Uniform Code of Military Justice, 10 U.S.C. § 886, in that he was absent without leave from July 15, 1969 to January 27, 1970. He entered a plea of guilty, was found guilty on the basis of that plea and sentenced to confinement at hard labor for 1 month and reduced from PFC E–3 to Private E–1. The sentence was approved by the Commanding Colonel and ordered executed. This item presents a serious doubt whether it can be said that petitioner's military service while in an active-duty status was honorable, especially since the certification establishes only that separation was under honorable conditions and is silent about honorable service while on active-duty status except for the record of the court-martial.

Thus, the court cannot say petitioner has established by a preponderance, on the present record, that he is eligible under 8 U.S.C. § 1440.

Putting that aspect to one side, and assuming there is eligibility, the court would be inclined to look at petitioner's character as of the petition filing date of June 1, 1977 and thereafter. Matters before then would be pertinent only as context or background for the period since filing.

The court's major source of inability to say that petitioner has carried his burden of persuasion on the element of good moral character arises from the presentation made by petitioner or on his behalf in respect to federal and state tax returns.

When he appeared before INS on March 17, 1982, he presented photocopies of Delaware and federal returns (as listed on the first page of the Memorandum dated November 5, 1982) for 1973–1977.

In the 1973 return, there is no occupation given, and the only income reported ($4,029.45) is from a partnership, King of Pizza and Restaurant, Sched. E–III, showing income of $6,025.50 and additional first year depreciation of $1,996.05, to leave the net amount entered. Deductions and exemptions left a taxable income of $1,113.46, and a tax of $163.15, which was washed out by applying that amount of a $727.91 tentative investment tax credit on new property having a cost of $10,398.75 as his share of partnership investment property.

There is no Form 1065 for the King of Pizza partnership, and no Schedule K–1 from that form. In the absence of a partnership return, there is nothing to indicate whether salaries or wages were paid, and hence whether supporting Forms 941 should be included. An individual return showing only income from a partnership without the partnership return (even though the partnership pays no tax as an entity) cannot be evaluated.

The 1974 return presents different problems. Occupation is there given as "Restaurant Operator". The return shows two sources of income: Line 9 shows $9,750. of wages, salaries, etc., but there is no W–2; and Line 12 shows a loss of $1,403.92 from "King of Pizza, Inc", noted to be a small business corporation with a different employer ID number than the King of Pizza partnership of 1973. An investment credit of $586.36 is taken on Line 17 against a tax of $1,010., leaving a balance of $423.64 to be paid, there being no withholding tax or estimated tax payment. The tax form 1120S, for a small business corporation, was not presented. This would be needed for any kind of evaluation of the individual return just as the form 1065 would be needed for 1973. What happened to the 1973 partnership does not appear in any way.

The 1975 return shows 3 sources of income: a salary of $17,950. from King of Pizza, Inc. (for which there is no W–2 but withholding tax is claimed), $135.74 of interest income, and a loss of $2,279.21 from King of Pizza, Inc. This return used income averaging and so has entries of taxable income from 1971 through 1975. For this year there is a Form 1120S for King of Pizza, Inc. for the fiscal year October 1,

1974 to September 30, 1975. Item F for "Additional Information Required" shows the corporation was formed December 5, 1973, while Item A on page 1 shows a January, 1974 date as the date of election as a small business corporation. In view of the fiscal year used, an initial short period return must have been filed running to September 30, 1974 (which would correlate with the 1974 individual return), but it is not among the papers supplied to INS. The fiscal year return that was supplied carries the familiar preprinted sticker with name, address and other taxpayer data, and this implies that an earlier return had been filed by the corporation, but this return was not supplied.

The summary of distributions shows petitioner and another as the sole stock owners, each owning 50 shares from October 1, 1974 (the first day of the fiscal year). Since the corporation was formed December 5, 1973, and had a loss of $2,807.84 for the preceding fiscal year (see Item I of Additional Information), someone else evidently owned the stock before, but without the previous return there is no information about this, or about how the stock was acquired.

The business is described as "eating and drinking", and the product or service as "food and alcoholic beverages". Gross income on Line 1 is reported as $162,729.74, and cost of goods sold as $74,267.81, which is nearly 46% of gross. For the food and beverage business, that item strikes the court as remarkably high, even well above the aggregate expense for officer's salary, wages, rent and utilities, which total not quite $57,000.

Only the petitioner was paid a salary (as vice-president). The other stockholder was paid nothing. There are two K–1 forms attached to the 1120–S return, but not to the 1040 return.

The corporate depreciation schedule is also puzzling because there seem to be 10 line item entries for various kinds of equipment with acquisition dates earlier than the December 5, 1973 date when the corporation was formed. Also, although both officer's salary and other wages and salaries are listed, there were no Form 941's provided as required by the order dated March 5, 1982.

The 1976 federal 1040 return shows $11,150. as salary from King of Pizza, Inc. (this time there *is* a W–2 form) interest of $5.15, and income from King of Pizza, Inc. of $10,174.82, but this time there is no 1120–S for the small business corporation. There is a form for automatic extension of time to file dated April 15, 1977 in which the tax expected to be owed for 1976 is given as $1,822.20, and the tax withheld as $1,822.20. No estimated tax payments are shown. In fact, the tax on the return as filed came to $3,643.63, leaving a balance of $1,821.43 to be paid after credit for withholding. Absent the form 1120–S, the K–1, the 941's, and so on, this return is impossible to evaluate beyond the strong indication that estimated returns probably were required but probably were not filed.

The actual filing date of the 1976 return does not appear, although the tax preparer's signature is dated May 11, 1977. In any event its preparation is shortly before the naturalization petition was filed in Wilmington on June 1, 1977.

No Delaware return was provided for 1976 though petitioner was still living there (at a different address) in early 1977.

The 1977 federal return is the most recent one provided to INS at the hearing of March 17, 1982. It is the only copy bearing stampings of the Brookhaven Service Center at Holtsville, N.Y., and the only copy of which it can be said with reasonable certainty that it is a copy of the return "as filed". All the earlier ones mentioned above have nothing to authenticate them as being the returns "as filed", if filed at all.

The 1977 return, evidently filed September 11, 1978, shows petitioner residing in Delran, N.J., instead of Delaware. He reports his occupation as "self-employed". The only income item entered, on Line 13, is a business loss of $3,989. From Schedule C.

Schedule C shows petitioner as the owner of "Sal's Pizza Restaurant", engaged in the sale of food at 1500 Millside Shopping Cen-

ter in Delran, N.J. The schedule reports that he owned the business at the end of 1977, and owned it for 12 months of the year.

Gross receipts are given on Line 1 as $90,827., and cost of goods sold on Line 2 as $48,122. This is nearly 53% of gross, and even more remarkable than the 46% in 1974–5 for King of Pizza, Inc. The gross profit is $42,705., with salaries and wages of more than $20,000. (higher than for the King of Pizza, Inc. operation for 1974–5 on a gross of nearly twice the volume).

Schedule C–1 shows an opening inventory at the beginning of 1977 of $545., but no "Sal's Pizza Restaurant" in New Jersey was reported on the 1976 returns. Schedule C–2, depreciation, includes machinery and equipment purchased in 1974, although this self-employed operation is not shown on any return before 1977, and two categories acquired in 1978 which is after the calendar year being reported. There is not a word about King of Pizza, Inc., or the partnership that preceded it. There is no 1977 New Jersey return submitted.

It should be noted here that both the 1976 return and the 1977 return, although filed late, were evidently filed during 1977 and 1978, and that there probably was a return filed for King of Pizza, Inc. for fiscal 1975–6. Yet, at the hearing of March 29, 1982, petitioner said (not under oath) that the "first records were taken in '76. They have been taking records from '76 on." [Tr. p. 33, lines 9–10]. If this is so, and yet returns were filed in 1977 and 1978, the claim that petitioner was unable to file returns after the 1977 return (in 1978) is extremely difficult to believe.

The returns submitted to the court at the end of June, 1982 are copies of final returns for the period 1978–1981, both New Jersey and federal.

The 1978 return is the first joint return, and gives an address in Sicklerville, N.J. Line 6c reports petitioner's son Daniel as living with him, although other statements in the present record indicate that he lives with his mother Linda, petitioner's first wife (see Exh. 5, the transcript of continued preliminary examination held March 17, 1982, page 6).

For 1978, petitioner is no longer self-employed, operating Sal's Pizza Restaurant. His only reported income on Line 20 is $26,000. of commissions from Carteret Development Corporation. There is no W–2, no 1099 or other supporting record. He also reports a loss of $493. from the sale of fixtures and equipment of Sal's Pizza, Delran, N.J., acquired "1977" and sold "1/78"

A Form 2210 attached to the 1978 return is filled out to show, as a basis for exception to the penalty for underpayment (there are no entries for withholding or estimated tax on lines 55 and 56) that there was no tax for 1977. Since the 1978 tax as reported is $4,081., and 80% or $3,264.80 should have been paid by January 15, 1979 but was not, the court does not believe the Form 2210 information applies to a case, like this, where not only was there no payment at all during the taxable year 1978, but no return was filed until mid-1982, more than 3 years late, as the signatures are dated June 19, 1982.

The 1979 return, also a joint return, is even more puzzling. Petitioner describes himself as "unemployed". Line 9 shows interest income of $50.36, and line 13 shows a business loss of $9,500. This is from Schedule C, which reports petitioner engaged as an entertainment producer at the Mayfair Apartments in Dover, Delaware. There is no entry at all for gross receipts, and total income, line 5, is "None". Deductions of $1,500. for legal and professional services, and $8,000. for recording studios, are claimed on lines 20 and 32a of Part II. These items make up the loss of $9,500. The second page of Schedule C is not reproduced in the copy provided. This return, too, is dated June 19, 1982.

The 1979 return is also unusual because although the adjusted gross income is a net loss of $9,449.64, with no tax at all, Schedule A is filled out for itemized deductions totalling more than $15,500. before deducting the standard allowance. A short-term capital loss of $6,700. is also reported on

Sched. D from the sale in February, 1979 of 500 shares of Fotomat for $3,300., which cost $10,000. when purchased in November, 1978.

The 1980 return, also dated June 19, 1982, reports petitioner as a "corporate officer" employed by A.W. Aspin, Inc., of 5425 Marlton Pike, Pennsauken, N.J. There is a W–2, but there is no employer ID number. The form says "applied for".

On wages of $6,502. and interest income of $39.09, the adjusted gross income is reported as $6,541.09. Schedule A itemizes deductions of nearly $18,400., which is reduced by the standard deduction to nearly $15,000., and there is no taxable income and no tax. The tax withheld of $1,032.20 is claimed for refund.

The 1981 return again reports petitioner employed as a "corporate officer", but this time there are two W–2's one for $18,200. of salary from Commonwealth Industries, Inc., and the other for $35,000. of salary from Commonwealth Contractors and Developers, Inc., for a total of $53,200. Both employers have their address at 5425 Marlton Pike in Pennsauken, N.J., and the first has an ID number while the second says "applied for".

Note is made of his testimony before the examiner on March 17, 1982, page 3, that he was at that time working for A.W. Aspin Construction Co., doing office work and as one of its officers. No mention is made of either "Commonwealth" corporation, which issued the W–2's for 1981. The W–2 for 1980 was from A.W. Aspin, Inc., at the same address as the two "Commonwealth" corporations.

Aside from the $53,200. of salaries entered on Line 7, interest income of $75.84 is reported on Line 8a and excluded on Line 8d, leaving no impact on adjusted gross income, Line 32, which is $53,200. Itemized deductions are nearly $21,400., and after subtracting the standard allowance nearly $18,000. is subtracted on Line 32b. After exemptions of $4,000., the taxable income on Line 34 is $31,223.53., and the tax (from the tax table based on taxable income) is $6,608. Since total withholding from both

employers was $7,610.25 (Line 55) and excess FICA and RRTA tax was $1,210.30 (Line 59), there was an overpayment claimed for refund of $2,212.55 (Line 64). This return is also dated June 19, 1982.

The statement that the son Daniel lives with petitioner, first entered on the 1978 return, is repeated on the 1979, 1980 and 1981 returns, further emphasizing the conflict with his testimony before the examiner on March 17, 1982.

There are other items of conflicting information. Thus, on his Application to File, dated March 15, 1976, signed April 9, 1976 and sworn to May 27, 1977 as corrected, he says that from January, 1973 to September, 1973, he was, "same as (a)", a stockholder-owner, in business as "owner-pizzeria" at 1500 Millside Shopping Center, Delran, N.J. In this period he was living at 8 Rosetree Lane in Trenton, N.J. with his sister. The pizzeria address given in Delran is the same as was shown for Sal's Pizza Restaurant on Schedule C of the 1977 return as a sole proprietorship for the full 12 months. Yet, the 1973 return, presumably prepared long before anyone took his records away, carries no indication of a business activity at that address. It reports only petitioner's income from King of Pizza and Restaurant, identified as a partnership (for which no Form 1065 was provided). Part III of Schedule E calls for name "and address" of partnerships, etc., but no address is given. Also, the Form 1120–S return for King of Pizza, Inc. for fiscal 1974–5 shows that the corporation was not formed until December 5, 1973, some 3 months after petitioner says he moved from Trenton, N.J. to the Rodney Village Apartments in Dover, Delaware.

The nature and amount of the itemized deductions for the years 1979, 1980 and 1981 also present rather unusual data. All three years claim home mortgage interest of about $7,500. a year, which implies that the residence at 7 Buxley Court, Sicklerville, N.J., was purchased sometime after the 1977 return was filed in 1978 (showing residence in Delran, N.J.) and February 1, 1979, when the first quarter of 1979 taxes would have been due. The 1978 return carries no

itemized deductions, and was not signed until June 19, 1982.

There is also deducted for 1979, 1980 and 1981, second mortgage interest to Worcester County National Bank of amounts ranging from $4,351. to $4,746.

The first mortgage interest implies a principal sum of about $50,000. if a 15% rate be assumed. The rate for the second mortgage would tend to be higher, but even if a 25% rate be assumed, the amounts imply additional principal of some $18,000. These figures suggest a purchase price in excess of $68,000.

The annual real estate tax is naturally an increasing amount, from $2,600. plus for 1979 to $3,658. for 1981.

The 1980 return claims N.J. sales tax on the purchase of two automobiles. One tax is $570., implying a net purchase price after trade-in of $11,400., and the other is $400., implying a net purchase price after trade-in of $8,000., using the 5% tax rate. In 1981, another sales tax on a car is claimed, this time for $1,067.41, which implies a net purchase price after trade-in of $21,348.20 using the same 5% tax rate.

At least two cars were evidently financed in the years 1980 and 1981, but not 1979. The 1979 return claims $835. as interest on an auto loan to "I.V.B." The same payee is listed as receiving auto loan interest of $193.84 in 1980, and $1,283. in 1981. Ford Motor Credit Co. is listed as having been paid interest on auto loan of $1,570. in 1980 and $1,685. in 1981.

Summarizing all gross income (aside from partnership or subchapter S losses) for the years 1973 through 1981, petitioner has indicated a total of some $141,000. for those 9 years, or about $15,600. a year. Cash deductions for the 6 years showing itemized deductions, plus federal tax for the 5 years showing a federal tax, FICA or self-employment tax for the 4 years showing such an item, and State income tax for the 7 years showing such tax, aggregate a total of more than $85,000., leaving net cash after those items of a little less than $56,000. If the $9,500. of cash business expense shown in 1979, and the short term loss of $6,700. on the Fotomat stock the same year are deducted, the net cash balance is just under $40,000. which works out to about $4,400. a year average to cover food, clothing, gasoline, heat, light, telephone, school tuition for the older son, medical expenses, insurance on automobiles and dwelling, and so on, not to mention capital cash such as would be needed to supply equity on automobiles and dwellings.

*Application of Law to the Facts.*

On the record of the preliminary examination as submitted on March 23, 1982 pursuant to § 335 of the 1952 Act, 8 U.S.C. § 1446, the court indicated that it was not persuaded that petitioner was of good moral character, or had been since his petition was filed in 1977, because of his failure to file tax returns required by law, and after articulating major reasons for that view, there was a colloquy ending in the arrangement, mentioned above, to afford more time to make a supplemental showing, see Tr. p. 60, line 1 to p. 65, line 16.

The further materials submitted have not altered that state of affairs. Instead, as the analysis of the 1978 through 1981 returns shows, they raise more questions than they answer.

The court does have the authority, under § 336(b) of the 1952 Act, 8 U.S.C. § 1447(b), to conduct an independent hearing. This was the course followed in *In re Berenyi,* 239 F.Supp. 725, at 727 (D.Mass). In doing so that court heard testimony of its own and expressly declined to rely on any of the preliminary examination materials in reaching its conclusions, see 385 U.S. at 634, and footnote 7, 87 S.Ct. at 669 and footnote 7.

In the present case, the subject-matter involved is much more complex. In *Berenyi,* the court heard two witnesses presented by the government who testified that petitioner had been a member of the Communist party in Hungary, as well as petitioner, his wife, and four other witnesses in opposition, and the issue quite obviously was a single one turning on credibility.

Here, on the contrary, such returns as were provided to INS for 1973 through 1977

were obviously incomplete in the face of the March 5, 1982 order. Note, for instance that on Schedule C of the 1977 return, the question "Was an Employer's Quarterly Federal Tax Return, Form 941, filed for this business for any quarter in 1977" is checked in the answer box for "Yes." Yet, although Form 941 is one of the kinds of supporting items called for, no such forms were produced as filed. No effort was made, evidently, to obtain copies of filed returns, despite the explanation made on February 22 and March 29 of a taxpayer's right to obtain such copies, and see *Neal v. U.S.,* 402 F.Supp. 678 (D.N.J., 1975).

The court indicated its readiness to order IRS to supply copies of records it was said to have taken, Tr. p. 22, line 24 to p. 23, line 14, but no such application was made. Nor is there any suggestion that there has been any IRS summons served on any third-party record keeper, such as a bank, which would then trigger a notice to the taxpayer involved under the amendments to 26 U.S.C. § 7609 made by the Tax Reform Act of 1976. Petitioner evidently had W–2 forms for 1980 and 1981, both of which showed not only the earnings but the federal income tax withheld, the state income tax withheld, and the FICA tax deducted. Real estate taxes paid can always be looked up at or obtained from the municipal tax collector. Sales tax on cars is easy to obtain from the dealer. Interest on first or second mortgages, or on auto loans, is easily obtained from the lenders.

In short, nothing presented supports the bare argument, made at the hearings, that petitioner had filed no federal or state income tax returns since the 1977 return (filed in 1978) because it was impossible.

Federal and state systems of income taxation in this country are based on a system of self-assessment and reporting. Taxpayers are expected to file returns and disclose the information needed to compute the tax. Many collateral systems help support this arrangement. Third parties from whom income is derived are not only obliged to keep records and file returns, but must inform taxpayers of the amounts they are to report. Such information is shown on Forms W–2 and 1099. It is shown on Form 1065 partnership and Form 1041 fiduciary returns. It is shown on Form 1120–S for small business corporation where there is an election under subchapter–S. It is shown on Forms K–1. It can be gathered from Forms 941.

While errors on tax returns will result in corrections and adjustments in the tax, as well as interest and sometimes penalty, it is expected that there will be errors in one direction or the other. The mere existence of errors in tax returns could not rationally be regarded as a basis for saying that a petitioner was not of good moral character.

Failure to file, however, is quite another matter so long as there is any indication of an obligation to file. Continued failure to file is even worse. Here, the testimony at the March 17, 1982 continued preliminary examination was that no returns had been filed since the 1977 return was. The explanation given appears to lack any credence, as noted above, on the present record.

This is not a case, like *Berenyi,* supra, where there was a single disputed fact issue: whether petitioner had been a member of the Communist party in Hungary. Rather, as the court indicated at the hearing of November 30, 1982, there are several fact questions and a legal question for which the record is incomplete.

The analysis of § 1440, noted above, was called to the attention of the parties so that they might address the question but the present record is judged inadequate to decide whether petitioner comes within § 1440. That section, as noted above, provides that:

"The executive department under which such person served shall determine whether persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions;" [§ 1440(a)].

It also provides that:

"service in the military * * * forces of the United States shall be proved by a duly authenticated certification from the

executive department under which the petitioner served * * * which shall state whether the petitioner served honorably in an active-duty status * * * and was separated from such service under honorable conditions;"

The certification is to be the proof of the statutory elements, and it can be made only by the executive department of service, and not by INS or by the court. On the present record, the certification only proves that petitioner was separated under honorable conditions. On the other question, whether he served honorably in an active duty status, the certification says nothing explicit, but attaches the court-martial order.

Aside from general awareness, the reported cases show that there are much more detailed military records than what was provided to INS in the case. In *John Doe v. General Services Adm'n,* 544 F.Supp. 530 (D.Md., 1982), for example, there is a discussion of the procedures for preventing public disclosure of the character of a military discharge and of the procedures or hearing leading to discharge, to the extent of the removal of SPN numbers from the DD–214 form that records the major details of service. However, commendable the effort may be to avoid public disclosure of such matters, the Congress has directed that the executive/military certify specific facts before a petitioner can come within § 1440. The disclosure to INS, and by it to the court, need not be made public, but both INS and the court must know what that record is if they are to correctly apply the statute.

If petitioner is not entitled to the benefits of § 1440, then the inquiry must go back to cover the 5 years before filing. This would then not be a matter of discretion. If he is entitled to those benefits, the burden to show good moral character remains, *U.S. v. Docherty,* 212 F.2d 40 (CA 5, 1954).

Also, at the hearing of November 30th, the court invited the views of the parties in respect to the procedures to be followed. After colloquy, petitioner's counsel asked that the accountant's certificate and the copies of returns dated June 19, 1982, for calendar 1978 through 1981 be marked in evidence, and they were. The court also asked petitioner's counsel whether the petitioner was making a demand that there be an examination of the petitioner and of the witnesses under oath before the court and in the presence of the court, and he said "No". He presented oral argument, supplementing the earlier briefs, and petitioner made an unsworn statement to the court.

The 1952 Act generally requires that every final hearing on a petition for naturalization "shall be had in open court before a judge * * * and * * * the petitioner and the witnesses * * * shall be examined under oath before the court and in the presence of the court". 8 U.S.C. § 1447(a).

There is an exception to the requirement for examination under oath before the court where the preliminary examination was conducted by a designated employee of INS under authority of § 1446(b), as was the case here. This exception, set out in § 1447(b) has its own exceptions: (1) at its discretion, the court may require the examination of the petitioner and the witnesses under oath before the court; and (2) if the petitioner demands it, the court "shall" do so.

Since counsel answered "No" to the question put, the matter became discretionary. The court was of the view then, and on further reflection remains of the view, that it should exercise its discretion not to require examination under oath before it at this time. The reasons are obvious.

On the uncertainty surrounding the applicability of § 1440, there was no witness present to provide any facts on the point. In fact, the statute rather obviously contemplates an "authenticated certification", which means a piece of paper with appropriate signatures, not live witnesses.

On the tax returns, it was plain from the record that INS had undertaken no analysis of those for years 1973–1977 before preparing its report and recommendation, and that it had not dealt with the returns for 1978–1981 that were signed June 19, 1982 and sent to the court after the report and recommendation had been filed.

As to other matters appearing on the various exhibits and from the hearing transcripts, the report and recommendation are silent.

From what was filed and what was said, the impression is that INS considers that its function is limited to determining whether one or another of the specific statutory bars to naturalization, numbered (1) through (8) in § 1101(f), is present. If none is present, it evidently does not make an evaluation of the statutory requirement that petitioner establish "good moral character", but leaves that question for the court. The court is accustomed to making determinations of this kind but the difficulty here is that INS seems not to have made any attempt to gather facts which the court could consider for the purpose.

To illustrate:

1. The papers filed show that petitioner was about 21 and his first wife was about 15 or 16 at marriage, and his first son was born some 6 to 7 months later. These circumstances carry implications but there are no facts beyond them to help the court decide whether they were significant or not.

2. On the questionnaire, item (13) has written in an explanation that petitioner had thought he was a citizen until he learned otherwise a short time before. Since the data indicates he was about 9 when he entered the U.S., and since the law required him to have an alien registration card, this comment strikes the court as odd. Why did he have the mistaken belief; was it because he thought his first marriage, to a native born citizen, made him a citizen? Was it because he had served in the Army? How did he learn he was not? Before, during or after military service and under what conditions?

3. The returns for 1973–1977 presented in March 1982, if filed at all, were filed in 1978 and before. The INS had asked for tax returns long before but none were produced until after the court's order of March 5, 1982. Why not? Where did the photocopies come from?

4. One year's return (for 1979) claims that petitioner was unemployed the entire year. His 1978 return showed him to be employed on commissions, amounting to $26,000. Did he claim and receive unemployment benefits?

These questions, as well as others outlined above in connection with what appears on the tax returns, are merely questions at this point, raising doubts of a kind the court feels would prevent it from making a positive finding that petitioner has carried the burden the law places on him to prove good moral character.

Some items noted above involve contradictions that, on further inquiry may or may not show matters of substance, or innocent mistake.

Petitioner's counsel was evidently convinced that the court had prejudged the matter, which was not the case. Rather, the court was concerned about the many questions raised, not the least of which was the complete failure to file any returns for 1978–1981 until late June of 1982, and it felt that because of the burden of persuasion the law places on petitioner, it should openly disclose those concerns and provide petitioner an opportunity to meet them.

Since this purpose was obviously misunderstood, although fully explained several times, the court believes the matter should be sent back to INS, so to speak, so that it may continue its preliminary examination on the matters it did not explore. The law appears to be that the recommendation made need not be accepted by the court. In this case, finding no positive bar, the designated examiner recommended that the petition be approved. The court disagrees, for the many reasons noted above, which sum up to the fact that the present record does not carry the burden, and there are numerous doubts which the law requires be resolved against petitioner and in favor of the United States.

To make certain of the affording of fundamental fairness, the court believes the proper course is to order the petition continued, 8 U.S.C. § 1446(d). The court is also aware that the number of designated examiners available at the Newark INS has been

reduced, but since the authority is in the Attorney General, there is no reason the court is aware of why an assistant U.S. Attorney familiar with the examination of federal tax returns cannot be designated for this petition, with authority to call on a revenue agent at IRS for any technical assistance needed.

Provision should also be made for expedited processing. The court has no information to suggest how long a continued investigation will take to complete. Once someone has examined the present record and exhibits, an estimate should be possible. If it can be done, the further work should be completed and a supplemental report ready for submission about the end of February.

Submit order accordingly.

## ON DISMISSAL OF PETITION FOR NATURALIZATION

This memorandum articulates the reasons underlying the order dated April 27, 1983 by which the petition for naturalization, and the present proceeding, were dismissed without prejudice to the filing of a new petition.

There is already in the record an extensive memorandum analyzing the record as it stood through the continued hearing date of November 30, 1982. The details need not be repeated.

In any event, because of the fact that materials presented after the initial report of the Service had not been the subject of examination, with further report and recommendations, the matter was sent back to the Service to complete its own investigation and submit its report and recommendations based on the enlarged record and examination.

The main reason, as evident from the memorandum dated December 2, 1982, was that at the time of the earlier investigation hearing by the Service in March, 1982 petitioner's testimony indicated that he had not filed State or federal tax returns for the years 1978, 1979, 1980 and 1981. The last return he said he filed was for 1977 (filed in 1978).

After providing petitioner an opportunity to provide missing returns and related documentation (e.g., W–2's, 1099's, 941's, 1065's, 1120–S's, K–1's, etc.) a collection of returns was sent directly to the court in chambers in late June, 1982, but the Service had not conducted any examination with them.

A further examination of petitioner was conducted by the Service on January 12, 1983 and that was sent to the court as a transcript, along with a report and recommendation dated February 25, 1983. These were directed to be filed by memorandum dated March 1, 1983, which also set a briefing schedule.

Petitioner's brief was timely received on March 22, 1983, and by Memorandum dated April 6, 1983, the court set final hearing for April 26, 1983 at 10 AM, with reminder that petitioner and the two witnesses who signed his petition were to appear so that they might be examined, if called for, see 8 U.S.C. § 1447(b):

At the call of the matter on April 26, 1983, no one appeared to answer the call. The court then prepared and signed the order of dismissal dated April 27, 1983.

*Eligibility under 8 U.S.C. § 1440.* Petitioner claims eligibility under this section. The subject is discussed in some detail in the December 2, 1982 memorandum. In any event, at the examination of January 12, 1983, petitioner was asked whether he had brought with him a copy of the long form version of his military DD–214 as he had been requested; he replied that he had not, but had brought only the short form DD–214. See Transcript p. 3.

In view of the difficulties already discussed, and the failure to bring the long form DD–214, the court is unable to make an affirmative finding on petitioner's eligibility under 8 U.S.C. § 1440. The court disagrees with the position taken in the report of 2/25/83 because the plain language requires certification of two separate facts: (1) honorable service in active duty status and (2) separation under honorable conditions. The only certification in the record shows the second condition satisfied

but only a copy of a court-martial conviction and sentence for the first. The court declines to rewrite the statute, but since there is no certification for condition 1, it merely finds that the present record does not show eligibility.

*Good moral character.* On the assumption that the record showed eligibility under 8 U.S.C. § 1440 (expressly not deciding that it did) good moral character would need to be shown for a reasonable period set by the court in its discretion in light of the circumstances of the individual case.

In this case and on that assumption, the court regards the period beginning with the filing of the petition in 1977 as reasonable for this purpose. Of course, if there is not eligibility under § 1440, the period involved would reach back to a date 5 years before the petition was filed. This is fully covered by the earlier ruling.

The transcript of January 12, 1983 examination by the Service shows that of all the requested income tax documentation, petitioner produced only his 1977 New Jersey return and the complete Schedule C for 1977 on his federal 1040 return.

As the first page of that return shows, an entry was made for $20,190 for salaries and wages paid to others. Page 2 shows no entry for cost of labor in calculating cost of goods sold. Yet, page 1 shows an answer that a Form 941 was filed in at least one quarter in 1977, but none was ever produced. Nor were any W–2's.

The earlier testimony that petitioner sent checks and cover letters to IRS every 2 or 3 weeks to make payment on taxes he claims to have been unable to calculate was not supported by any cancelled check or copy of any cover letter at the January investigation.

New items, orally described without any supporting documents at all, were testified to. At pages 17 and 18 petitioner said he recovered $125,000 from the settlement of a lawsuit, and between $40,000 and $60,000 from his aunt, just before he bought his $135,000 house in Sicklerville in 1978 or 1979 (after the petition was filed).

This kind of new testimony, unsupported by what ought to be easy documentation to obtain, does not resolve doubts raised by the earlier record but raises new ones.

As carefully pointed out before, the law puts the burden of persuasion on petitioner. Since he and his witnesses did not bother to appear at the date set for hearing, the court finds that he has failed to carry his burden of persuasion, and so his petition can only be dismissed.

